[No. S004780. Crim. No. 26414. Nov. 18, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
JEFFREY DEAN WASH, Defendant and Appellant.

224

228

[blacked out]

[blacked out]

## COUNSEL

John Patrick Dwyer, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Mark S. Howell, Aileen Bunney and Christopher J. Wei, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ARABIAN, J.**—Defendant Jeffrey Dean Wash was convicted by a jury of the first degree murder (Pen. Code, §§ 187, 189),[1] rape (§ 261, former subd. (2)) and robbery (§ 211) of Erin King, as well as the first degree murder and robbery of Shelly Siegel, and two counts of burglary (§ 459). The jury also found true the special circumstance allegations that defendant committed the murder of Erin King during the course of rape (§ 190.2, subd. (a)(17)(iii)), robbery (§ 190.2, subd. (a)(17)(i)), and burglary (§ 190.2, subd. (a)(17)(vii)), and committed the murder of Shelly Siegel during the course of a robbery and burglary. With respect to the crimes against Erin King, the jury found true allegations that defendant personally used a deadly weapon (§ 12022, subd. (b)), personally used a firearm (§ 12022.5), and inflicted great bodily injury (§ 1203.075). With respect to the crimes against Shelly Siegel, the jury found true allegations that defendant personally used a firearm and inflicted great bodily injury. The jury also found that defendant personally used a deadly weapon during the commission of the burglaries.

When the jury was unable to reach a penalty verdict, a mistrial was declared, a new jury was empanelled, and the issue of penalty was retried. The second jury returned a verdict of death. After denying defendant's motion for modification of the penalty verdict, the court imposed a sentence of death. This appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).)

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

## I. FACTS

### A. GUILT PHASE EVIDENCE

#### 1. *The Prosecution's Case*

On the afternoon of March 23, 1984, Philip Durbin returned home from a two-day business trip in Las Vegas. Philip lived with his wife, Shelly Siegel, on the Sundial Ranch, located in the sprawling, arid hill country on the outskirts of Livermore. Erin King, a young ranch assistant, lived in a small trailer on the grounds of the ranch.

As he drove into the ranch Philip noticed that the mailbox was unusually full and his brown Buick station wagon was missing. Entering the kitchen he found the billfold belonging to Shelly lying open on the table and noticed the broken handle of a posthole digger, which he normally kept in a cabinet, on the countertop. He also saw a length of parachute cord on a chair.

Entering the bedroom, Philip noticed what appeared to be the other end of the broken posthole digger. After a few moments, he saw Shelly lying face up at the foot of the bed. There were holes in her shirt and bloodstains. Philip realized right away that his wife was not alive.

Philip checked the closet and discovered that his .22-caliber nine-shot revolver, holster and ammunition were missing. He returned to the kitchen, dialed 911 and was told to wait outside for the police to arrive. Two Alameda County deputy sheriffs responded to the scene. One of the deputies obtained a key from Philip and entered the trailer where he found the lifeless body of Erin King on the bed. Her wrists were bound behind her, her head was wrapped in a bound towel, and her mouth was gagged. The towel had a bullet hole in it surrounded by a ring of black powder.

An autopsy revealed that Shelly had suffered a very severe blow to the head from a blunt object, consistent with the posthole handle found at the scene. A total of six bullet wounds were found in Shelly's chest and side; gunsmoke residue surrounding the wounds indicated that several shots had been fired from very close range. Any one of four of the bullet wounds would have been sufficient to end her life.

The autopsy of Erin King's body revealed a bullet wound in the back of her head; the shot, which went through the towel and entered the frontal lobe of the brain, was probably fatal. There were also 19 stab wounds on Erin's body; one particularly deep wound entered through the neck and penetrated

into the esophagus and chest cavity. The remainder were clustered about her chest and back. Several were alone sufficient to cause death. Oral, anal and vaginal swabs were also prepared. Tests revealed the presence of semen on the vaginal swab, the sweatpants the victim wore, and two articles of clothing found on the bed. The condition of the victim's anus was consistent with having been sodomized.

The police investigation focused almost immediately on defendant. Originally from Indianapolis, Indiana, defendant had driven to Modesto with his friend, Harold Settles, and Jim Brunning in the autumn of 1983. In November, he answered an advertisement in a Modesto newspaper calling for a ranch hand. Philip Durbin and Shelly Siegel had placed the ad to find someone to assist Shelly with the care of the horses and to perform general repair and maintenance. They hired defendant for $100 per week plus room and board. Defendant stayed in the small trailer on the ranch.

Philip was generally satisfied with defendant's work and occasionally allowed defendant the use of his Buick station wagon. Defendant told his friend, John Ritesman, that he generally got along with Philip and Shelly. Nevertheless, on several occasions defendant discussed with Ritesman the possibility of stealing money, guns and Philip's power tools from the ranch. Later, he told Ritesman that he felt bored and isolated and was angry because his telephone calls were deducted from his paycheck. Defendant also expressed an interest in Shelly, telling Ritesman that he would like "to slam her once."

In late February 1984, defendant left his job at the ranch. He called Ritesman to tell him that he had quit and again expressed an interest in stealing Philip's power tools and guns. Defendant stayed with Ritesman and his girlfriend, Lauri Martin, for about a month. During this time, defendant instructed Ritesman to call the ranch to see if his old job was still available. Ritesman informed defendant that a girl had started working there already. The girl was Erin King, 19 years old, who had recently graduated from high school and was working until her enlistment in the Army was finalized.

Over the weekend preceding the murders, defendant and Ritesman discussed the idea of returning to the ranch and robbing and tying up the occupants. Defendant said that tying them up was not enough, that if he had a gun he would shoot them. The following Tuesday, March 20th, there was a party at Ritesman's house. Defendant drank beer and shared several marijuana joints and a quarter to a half gram of cocaine with the others in attendance. While at the party, defendant again expressed a desire to return to the ranch to rob and murder the occupants.

The party lasted into the early morning hours of the following day, Wednesday, March 21. Around 5 a.m., Lauri drove defendant and Ritesman to another friend's house. Before they left, Ritesman gave defendant a knife, supposedly for protection. From there, defendant and Ritesman obtained another ride, and defendant was dropped off near the intersection of several major highways. He had earlier expressed an interest in hitchhiking to Long Beach.

Later that afternoon, Merle Wellman and her husband (Philip and Shelly's neighbors) were driving down the usually isolated Tesla Road on a shopping trip into town when they saw someone walking toward the Sundial Ranch. He was about six miles from the ranch. Two hours later, when they returned, they saw the same person about a quarter mile from the ranch. Timothy Gonser, an employee of the Wellmans, was leaving the ranch just as the Wellmans returned. He also recalled seeing a man walking on the normally deserted Tesla Road. Both Mrs. Wellman and Timothy Gonser later identified defendant's photograph from a photographic lineup as the man they had seen on the road.

That evening, Ruth King received a telephone call from her daughter, Erin. They discussed Erin's plans concerning the Army. As she was about to hang up, Mrs. King heard Erin call out and perceived what sounded like a distant conversation, but she could not distinguish the words. It was the last conversation that Mrs. King ever had with her daughter.[2]

Following the killings, defendant drove Philip Durbin's station wagon to Modesto, checked into a motel under an assumed name, and then returned to Indianapolis by bus, where he stayed several days in a motel with his friend, Harold Settles. During this period, defendant told another friend, Joey Payne, that he had killed two women. Payne helped to arrange the sale of defendant's gun, a nine-shot .22-caliber pistol. Defendant also told Settles that he had murdered two women and had raped one of them. The police later contacted Payne, who assisted them in recovering defendant's gun. Expert analysis of the bullets removed from Shelly Siegel's body determined that they had been fired from this weapon.

A fingerprint found on the door to Erin King's trailer matched the fingerprint of defendant's left middle finger. A palm print found on one of Erin's empty pay envelopes matched defendant's palm print. Electrophoretic analysis of the semen samples taken from Erin's vagina and clothes showed them to be consistent with defendant's blood type and secretor status, characteristics shared by 8 percent of the population.

---

[2]As discussed, *post,* at pages 270 to 271, Mrs. King testified somewhat inconsistently at the second penalty trial that she heard a male voice and several distinct phrases.

Two weeks after the killings at the Sundial Ranch, California authorities interviewed defendant at an Indianapolis police station. He eventually made a full confession to the crimes, admitting that he had returned to the ranch with the intent to rob and kill the people there. During the course of the interrogation, defendant consented to a search of his duffel bag. Among other items, the police seized a knife which forensic analysis determined to be consistent with the stab wounds inflicted on Erin King.

### 2. The Defense Case

Defendant called no witnesses at the guilt phase. Through cross-examination of John Ritesman and Lauri Martin (Ritesman's girlfriend) defense counsel attempted to show that defendant was depressed about leaving his job at the ranch and was impaired by the ingestion of drugs and alcohol at Ritesman's party, which lasted into the early morning hours of the day of the murders. Joey Payne testified that defendant's eyes looked glassy, like he was going to cry, when he told Payne about the killings.

### B. PENALTY PHASE EVIDENCE

### 1. The Prosecution Case

The first penalty trial resulted in a hung jury. As a result, the prosecution essentially retried the guilt phase at the second penalty trial, calling many of the same witnesses to establish the facts and circumstances of the crimes.

In addition, the prosecutor introduced as evidence in aggravation certified copies of defendant's two prior burglary convictions in Indiana.

### 2. The Defense Case

Defendant testified in his own behalf. He admitted the burglaries in Indiana and claimed that he was having trouble with drugs and alcohol at the time. He described the amount of beer and drugs he had consumed the night before the murders, although he conceded that they had "mostly worn off" by the next day. Although he acknowledged returning to the Sundial Ranch to steal "what I could," defendant claimed, contrary to the statements he made to the police, that he had not intended to kill anyone. When he arrived at the ranch, he saw Shelly outside feeding the horses. He slipped inside, removed the money from Shelly's wallet and took Philip's gun from the bedroom closet, which he loaded and stuck in his pants. He slipped a pair of pantyhose over his face and armed himself with the wooden handle of a posthole digger. When Shelly entered, surprising him, defendant struck her

with the wooden handle and shoved her on the bed. When she struggled, he removed the gun and shot her twice, then three more times in rapid succession. Afterwards he became sick and vomited.

Sometime thereafter, defendant noticed Erin King through the window and realized it was the girl who had replaced him as ranch assistant. Afraid that she might have heard something, he entered her trailer to tie her up. He found Erin on the phone, grabbed her by the neck and tied her hands behind her back. Defendant then threatened Erin with a knife and took about $200 from her pay envelope. She begged him to leave her enough money to send her clothes home because she was about to enter the Army. After talking with Erin for a short while, defendant removed his mask, laid Erin on the bed, removed her tampon and orally copulated and raped her. He denied, however, that he ejaculated or that he sodomized her.[3] Afterwards, defendant bound and gagged the victim, and wrapped her head in a towel. Defendant then recalled stabbing her in the neck once, but could not remember making any of the other stab wounds. When he finished with the knife, he pointed the gun at her head, putting it close to the towel, and shot her once.

Defendant acknowledged that after returning to Indianapolis he told Joey Paine about the murders. He denied, however, that he told John Ritesman he wanted to "slam" Shelly Siegel. He also stated that he lied to the police about intending to rape and murder the victims, explaining that at the time he wanted to look as "guilty as possible," that he "wanted to die." Defendant claimed to have attempted suicide while awaiting trial, and concluded his testimony by indicating that he was "sorry" he committed the crimes and could not understand his actions.

Several friends and family members also testified for the defense. Tom Brunning, a childhood friend, described defendant as "shy" and "sensitive." Defendant's mother, Doris Wash, testified that defendant had nine brothers and sisters, and was helpful around the house. His father, Lloyd Wash, noted that the entire family was raised in a converted garage with no indoor plumbing. Defendant shared one room with his brothers. Defendant's sister, Debra Burdine, noted that nearly all of the Wash children had gotten into trouble with alcohol, drugs, truancy, and prostitution. Like all but one of his siblings, defendant did not graduate from high school. According to Debra, her parents displayed very little affection and gave defendant little attention.

Defendant's aunt, Martha Overbey, testified in more detail about defendant's troubled upbringing, stating that his mother was verbally and physically abusive toward the children and that his father remained aloof except

---

[3] In fact, the large amount of semen found on the bed suggested that the assailant had ejaculated more than once.

when he whipped them. Defendant's sister-in-law, Patricia Wash, also testified that defendant's parents displayed almost no affection toward the children, and recounted several instances of defendant's kindness to others.

Shelby Schaefer was the final defense witness. A friend from Indiana, Ms. Schaefer testified that defendant was a "sensitive" man from an unhappy family. She recounted several examples of defendant's kindness. She described him as lonely, said that he had expressed deep remorse and sorrow for his crimes, and noted that he had written several poems in prison.

## II. DISCUSSION[4]

### A. GUILT PHASE ISSUES

#### 1. *Alleged Miranda Violations*

Defendant contends that his taped confession was the product of multiple *Miranda* violations (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], and that its introduction at trial compels reversal.

Shortly after defendant was arrested in Indiana, two officers from the Alameda County Sheriff's Department (Detective-Sergeants Little and McGrail) and an Alameda County deputy district attorney (Martin Brown) flew to Indianapolis to interrogate defendant about the murders at the Sundial Ranch. They met defendant at the police station where he was being held in custody. Mr. Brown advised defendant of his rights and defendant agreed to make a statement. During the following two-and-a-half-hour interrogation, defendant gave a detailed confession to the crimes.

Defendant subsequently moved to suppress the confession at a section 995 hearing and at both the guilt and second penalty phase trials. The motions were denied. Defendant renews the substance of his claim here, arguing that the police authorities violated his *Miranda* rights in four separate respects. We assess each contention in light of the following principles.

In considering a claim that a statement or confession is inadmissible because it was obtained in violation of a defendant's rights under *Miranda* v. *Arizona, supra,* 384 U.S. 436, we accept the trial court's resolution of disputed facts and inferences, and its evaluation of credibility, if supported by substantial evidence. (*People* v. *Kelly* (1990) 51 Cal.3d 931, 947 [275

---

[4]We have reordered the contentions set forth in defendant's opening brief to conform more closely to the chronology of events at trial.

Cal.Rptr. 160, 800 P.2d 516].) Although we independently determine whether, from the undisputed facts and those properly found by the trial court, the challenged statements were illegally obtained (*ibid.*), we " 'give great weight to the considered conclusions' of a lower court that has previously reviewed the same evidence." (*People* v. *Jennings* (1988) 46 Cal.3d 963, 979 [251 Cal.Rptr. 278, 760 P.2d 475], quoting *Miller* v. *Fenton* (1985) 474 U.S. 104, 112 [88 L.Ed.2d 405, 412, 106 S.Ct. 445]; accord, *People* v. *Kelly, supra,* 51 Cal.3d at p. 947.) Because the crimes in this case occurred after the addition of section 28, subdivision (d) to article I of the California Constitution, the voluntariness of defendant's waiver and confession must be established by a preponderance of the evidence. (*People* v. *Markham* (1989) 49 Cal.3d 63 [260 Cal.Rptr. 273, 775 P.2d 1042].) ·

■ Defendant first contends that his *Miranda* warnings were inadequate because they failed to inform him that he was entitled to counsel during questioning. (See *Fare* v. *Michael C.* (1979) 442 U.S. 707, 717 [61 L.Ed.2d 197, 207, 99 S.Ct. 2560]; *Miranda* v. *Arizona, supra,* 384 U.S. at p. 473 [16 L.Ed.2d at pp. 772-773].) At the beginning of the taped interview, the deputy district attorney advised defendant of his rights as follows: "[Y]ou have the right to remain silent, anything you say can and will be used against you in a court of law, you have the right to have an attorney present before any questioning if you wish one, if you cannot—if you cannot afford . . . an attorney one will be provided to you at no cost before any questioning begins. Now do you understand those rights?"

*Miranda* holds that a suspect must be apprised, inter alia, that he has the right to the presence of an attorney during questioning, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. (384 U.S. at pp. 478-479 [16 L.Ed.2d at pp. 725-727].) Although the warning given to defendant here deviated from the standard form in failing to expressly state that defendant had the right to counsel both before and *during* questioning, we are not persuaded—as defendant's argument implies—that the language was so ambiguous or confusing as to lead defendant to believe that counsel would be provided before questioning, and then summarily removed once questioning began. (See *People* v. *Valdivia* (1986) 180 Cal.App.3d 657, 662-664 [226 Cal.Rptr. 144] [admonition that defendant had the right to counsel before questioning adequately apprised defendant of his *Miranda* rights].) As the high court has observed, the *Miranda* warnings are "prophylactic" (*Michigan* v. *Tucker* (1974) 417 U.S. 433, 446 [41 L.Ed.2d 182, 194, 94 S.Ct. 2357]) and need not be presented in any particular formulation or "talismanic incantation." (*California* v. *Prysock* (1981) 453 U.S. 355, 359 [69 L.Ed.2d 696, 701, 101 S.Ct. 2806].) The essential inquiry is simply whether the warnings reasonably " '[c]onvey to [a

suspect] his rights as required by *Miranda.*' " (*Duckworth* v. *Eagan* (1989) 492 U.S. 195, 203 [106 L.Ed.2d 166, 177, 109 S.Ct. 2875].) We are satisfied that the warnings given defendant here "reasonably conveyed" his right to have an attorney present during questioning.

■ Defendant next contends that he invoked his right to silence during the course of the interview, and that, as a result, the bulk of the confession which followed was inadmissible under *Miranda* and its progeny. The asserted invocation occurred about one hour into the interrogation. The police had been questioning defendant about his movements since leaving his job at the Sundial Ranch when defendant asked, "Um, what's this all about?" Deputy District Attorney Brown responded that they were investigating the murders of two women at the Sundial Ranch and that several witnesses had seen defendant walking toward the ranch on the morning of the murders. Defendant had earlier denied returning to the ranch and Mr. Brown observed that the police "want to resolve this one way or another in terms of whether you were there or whether you weren't there." Defendant indicated that he understood and stated that the murders "shocked" him. The following colloquy then occurred:

"[BROWN]: Uh huh. And I assume that you're . . . you're willing to talk to us . . . about it and give us the . . . the details that you're giving us.

"[WASH]: I don't know if I wanna talk anymore since it's someone killed, you know.

"[BROWN]: Okay. That's totally up to you to decide whether or not you do or not. Um, if you wanna talk to us and give us this information that's fine. If you don't that's obviously your right, too.

"[DETECTIVE LITTLE]: Don't you like, uh, I thought you said that you liked Shelley [*sic*]?

"[WASH]: Yeah, I s . . . .

"[DETECTIVE LITTLE]: You liked them?

"[WASH]: That's why I'm stunned, stunned.

"[DETECTIVE LITTLE]: Well, don't you wanna help, uh, with that?"

After a brief interruption from a knock on the door, the interview continued.

"[BROWN]: All right, in any event, um, there are . . . ."

"[DETECTIVE LITTLE]: (Unintelligible).

"[BROWN]: . . . a number of . . . of items that we wanna ask you about to resolve this one way or another. And, uh, like I said it's up to you as to whether or not you wanna give us the information so that we can check it out one way or another or not. Um, that's why I wanted to go through your rights with you at the beginning so you could decide if you wanted to talk to us about this or not."

After a pause of about 15 seconds, defendant replied, "Yeah. Keep on talking."

The interrogation continued and defendant eventually confessed to the crimes. At trial defendant moved to suppress the confession, claiming that by stating, "I don't know if I wanna talk anymore since it's someone killed, you know," he had effectively invoked his right to remain silent. The trial court, after listening to the tape, ruled that defendant had not actually invoked his right to remain silent but simply considered whether he wished to continue in light of the seriousness of the crimes. After considering the matter and being reminded of his rights, he chose to continue talking.

Having independently reviewed the taped interrogation (*People* v. *Ashmus* (1991) 54 Cal.3d 932, 969 [2 Cal.Rptr.2d 112, 820 P.2d 214]), we conclude that the trial court's ruling was sound. The law is clear. Once warnings have been given, "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." (*Miranda* v. *Arizona, supra,* 384 U.S. at pp. 473-474 [16 L.Ed.2d at pp. 722-723].) Once such a request is made, it must be "scrupulously honored" (*id.* at p. 479 [16 L.Ed.2d at pp. 726-727]); the police may not attempt to circumvent the suspect's decision "by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind." (*Michigan* v. *Mosley* (1975) 423 U.S. 96, 105-106 [46 L.Ed.2d 313, 322-323, 96 S.Ct. 321].)

Although it is true that a suspect's assertion of the privilege need not be "unequivocal" (*People* v. *Thompson* (1990) 50 Cal.3d 134, 165 [266 Cal.Rptr. 309, 785 P.2d 857]) or "invoked with unmistakable clarity" (*People* v. *Randall* (1970) 1 Cal.3d 948, 955 [83 Cal.Rptr. 658, 464 P.2d 114]), it is evident that, viewed in context, defendant's statement here does not amount to even an equivocal assertion of his right to remain silent. Defendant expressed uncertainty as to whether he wished to continue—"I don't

know if I wanna talk anymore." The officers then attempted to obtain clarification of his intentions, twice reminding defendant of his right to remain silent. After some thought, he plainly stated that he wished to proceed with the interrogation. ■ As we recently explained in *People* v. *Johnson* (1993) *ante*, page 1 [23 Cal.Rptr.2d 593, 859 P.2d 673], where a defendant expresses ambiguous remarks falling short of an invocation of his *Miranda* rights, the officers may continue talking for the purpose of obtaining clarification of his intentions. (*Id.* at p. 27.) That is precisely what occurred here. Accordingly, we find no *Miranda* violation in this regard. Similarly, the brief remarks by Detective Little ("I thought you said you liked Shelley" [*sic*]; "Don't you wanna help. . ."), while perhaps ill-advised, cannot reasonably be construed as repeated attempts "to wear down [defendant's] resistance" (*Michigan* v. *Mosley, supra,* 423 U.S. at pp. 105-106 [46 L.Ed.2d at pp. 322-323]), nor, clearly, in light of " 'the totality of the circumstances' " (*Moran* v. *Burbine* (1986) 475 U.S. 412, 421 [89 L.Ed.2d 410, 420-421, 106 S.Ct. 1135]), did they operate as such.

■ Defendant next claims that the deputy district attorney's failure to inform him that his admissions could be relevant to the state's decision to seek the death penalty precludes a finding that defendant knowingly and intelligently waived his *Miranda* rights. We recently considered and rejected a similar argument in *People* v. *Hill* (1992) 3 Cal.4th 959 [13 Cal.Rptr.2d 475, 839 P.2d 984].) Noting that a valid waiver of *Miranda* rights does not require that a suspect be informed of the potential charges against him (*Colorado* v. *Spring* (1987) 479 U.S. 564 [93 L.Ed.2d 954, 107 S.Ct. 851]; *People* v. *Sanders* (1990) 51 Cal.3d 471, 512-514 [273 Cal.Rptr. 537, 797 P.2d 561]), "there is no basis," we reasoned, "for concluding that he must be advised of the possible punishment for those charges if proven." (*People* v. *Hill, supra,* 3 Cal.4th at p. 982.) Thus, defendant was adequately informed of the consequences of waiving his rights.

■ Finally, defendant contends the authorities improperly interrogated him prior to advising him of his *Miranda* rights. He claims that his subsequent post-*Miranda* statements were the product of the illegality and must be suppressed. As explained below, the argument lacks merit.

At the start of the taped interview, Deputy District Attorney Brown set the scene as follows:

"[BROWN]: All right. Now, Jeffrey, we, uh, we came in a while ago and just basically introduced ourselves and asked you a few general questions and told you that we wanted to talk to you a bit and then we basically set up the tape recorders . . . is that correct?

"[WASH]: Yeah."

Shortly thereafter, defendant was advised of his *Miranda* rights, indicated that he wished to speak, and Mr. Brown began his questioning:

"[BROWN]: I guess what we'll do is, uh, we'll start back on you—when you were in California in November. You . . . indicated you were in California in November of 1983, is that correct?

"[WASH]: Yes.

"[BROWN]: And at that time you got a job working on a ranch?

"[WASH]: Yes."

Based on the foregoing, defendant claimed at trial that police questioning prior to the *Miranda* warnings elicited the incriminating admission from defendant that he had recently been in California working on a ranch. This factual admission, he argued, formed the basis of all subsequent questioning concerning the crimes in California to which he ultimately confessed. Thus, the non-*Mirandized* interrogation "tainted" the confession and compelled its suppression under state and federal law.

Both Deputy District Attorney Brown and Detective McGrail testified at the suppression hearings. Neither had any specific recollection of questioning defendant before the taped interview about his activities in California. Mr. Brown speculated that defendant had volunteered the information that he had been working on a ranch in California, but could not recall the exact circumstances. The trial court ruled that the statement was not elicited through police interrogation.

The record is unclear whether the defendant's pre-*Miranda* statement was volunteered or the product of police interrogation; the authorities present could not specifically recall how the information was obtained. Even if we were to assume, however, that the statement was elicited through questioning, we would still reject defendant's claim that his subsequent post-*Miranda* confession must be suppressed as the product of that interrogation. As we have explained: "In *Oregon* v. *Elstad* (1985) 470 U.S. 298 [84 L.Ed.2d 222, 105 S.Ct. 1285], the United States Supreme Court rejected the notion that a subsequent confession must necessarily be excluded because it followed an otherwise voluntary statement that was given without *Miranda* warnings: 'It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other

circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.' (470 U.S. at p. 309 [84 L.Ed.2d at p. 232].)" (*People* v. *Lewis* (1990) 50 Cal.3d 262, 275 [266 Cal.Rptr. 834, 786 P.2d 892].)

The record here discloses that defendant admitted prior to the taped interview that he had worked at a ranch in California, and subsequently gave a full confession after having been advised of, and having waived, his *Miranda* rights. There is no evidence that the pre-*Miranda* statement was obtained through improper police tactics or coercion.[5] Therefore, under *Oregon* v. *Elstad* (1985) 470 U.S. 298 [84 L.Ed.2d 222, 105 S.Ct. 1285], which we have adopted as the standard in California (see *People* v. *Lewis*, *supra*, 50 Cal.3d at pp. 275-276), the confession need not be suppressed. ■ "[A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." (*Oregon* v. *Elstad*, *supra*, 470 U.S. at p. 314 [84 L.Ed.2d at pp. 235-236].)[6]

## 2. *Electrophoretic Evidence*

■ Defendant next challenges the trial court's decision to admit the results of an electrophoretic analysis of semen samples removed from Erin King's clothing and body.[7] The analysis showed the semen to be consistent with defendant's secretor status and phosphoglucomutase type; the People's

---

[5]Although defendant alleges that the pre-*Miranda* statement was coerced, he cites nothing in the record to support this claim.

[6]Our holding that defendant's *Miranda* rights were not violated and his confession was not coerced disposes of defendant's related claims that: (1) the police search of his belongings at the police station, to which he consented during the course of the interrogation, was somehow invalidated by the alleged *Miranda* violation, and (2) the use of the allegedly tainted confession at the penalty phase compels reversal of the penalty verdict.

[7]Electrophoresis allows typing of individual blood proteins and enzymes by a method that separates electrically charged molecules, yielding particular protein "types." (*People* v. *Morris* (1991) 53 Cal.3d 152, 206-207 [279 Cal.Rptr. 720, 807 P.2d 949]; *People* v. *Brown* (1985) 40 Cal.3d 512, 528-529 [220 Cal.Rptr. 637, 709 P.2d 440]; *People* v. *Reilly* (1987) 196 Cal.App.3d 1127 [242 Cal.Rptr. 496].) Testing may also determine whether an individual "secretes" these substances into bodily fluids such as semen, vaginal secretions and saliva. (*People* v. *Brown*, *supra*, 40 Cal.3d at p. 529.)

expert testified that 8 percent of the population shared these particular characteristics.

Defendant moved prior to both the guilt and second penalty phase trials to exclude the evidence on the ground that it failed to meet the test of scientific reliability under the *Kelly/Frye* rule. (*People* v. *Kelly* (1976) 17 Cal.3d 24, 30 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013, 1014 [54 App.D.C. 46, 34 A.L.R. 145].) ■ The rule requires the proponent of expert testimony based on the application of a new scientific technique to satisfy three criteria: (1) the technique or method is sufficiently established to have gained general acceptance in its field; (2) testimony with respect to the technique and its application is offered by a properly qualified expert; and (3) correct scientific procedures have been used in the particular case. (*People* v. *Kelly*, *supra*, 17 Cal.3d at p. 30; *People* v. *Morris*, *supra*, 53 Cal.3d at p. 206.)

■ At the pretrial admissibility hearing, defendant challenged the evidence solely on the ground that it failed to satisfy the first criterion, general acceptance of the method's reliability in the scientific community. The parties stipulated that the court could rely on the trial record in *People* v. *Reilly*, *supra*, 196 Cal.App.3d 1127, in determining the reliability of electrophoretic testing. In addition, defendant called one expert witness, Dr. Thomas Blake. At the conclusion of the hearing, the trial court found that the People had met their burden and ruled the evidence to be admissible.

Defendant renews his challenge here to the general admissibility of electrophoretic testing. We have considered and rejected this contention on several occasions. (*People* v. *Fierro* (1991) 1 Cal.4th 173, 214-215 [3 Cal.Rptr.2d 426, 821 P.2d 1302]; *People* v. *Morris*, *supra*, 53 Cal.3d at pp. 206-207; *People* v. *Cooper* (1991) 53 Cal.3d 771, 812 [281 Cal.Rptr. 90, 809 P.2d 865].)[8] Nothing in the instant record causes us to reconsider the matter.

Defendant also specifically challenges the reliability of electrophoretic testing of semen. He notes that *Reilly* was confined to the admissibility of electrophoretic testing of blood, as were our decisions in *Fierro*, *Cooper* and *Morris*. In *People* v. *Ashmus*, *supra*, 54 Cal.3d 932, we upheld the trial court's finding that electrophoretic testing of semen was generally accepted as reliable in the relevant scientific community (*id.* at pp. 971-972), but declined to extend our holding beyond the specific record made by the parties. (*Id.* at pp. 972-973, fn. 10.)

---

[8]As here, the trial courts in both *Fierro* and *Morris* relied on the extensive trial record in *People* v. *Reilly*, *supra*, 196 Cal.App.3d 1127. (*People* v. *Fierro*, *supra*, 1 Cal.4th at p. 214, fn. 11; *People* v. *Morris*, *supra*, 53 Cal.3d at p. 207, fn. 9.)

After independent review of the record here, we also conclude that the trial court's ruling was proper on the record before it. Dr. Blake, the only expert who testified, stated that in general electrophoretic analysis of blood and semen are equally reliable. Although he acknowledged that semen samples may degrade faster than blood samples and that semen analysis may be complicated by the admixture of other fluids such as saliva, vaginal secretions and sweat in the test sample, he cited these as facts to be accounted for in the testing procedures rather than as grounds for deeming electrophoretic analysis of semen to be unreliable. The undisputed evidence, therefore, amply supported the trial court's finding that the People had met their burden under the *Kelly/Frye* rule.[9]

### 3. *The Photographic Lineups*

Defendant moved prior to the guilt phase trial to suppress the results of two photographic lineups which he claimed were impermissibly suggestive and therefore violated his state and federal due process rights. The trial court held an evidentiary hearing at which the following facts emerged: Several days after the killings, the police visited Merle Wellman, Shelly and Philip's neighbor, who helped to create a composite or Identikit picture of the man she had seen walking on Tesla Road the day of the murders. A few days later, the police returned and asked Mrs. Wellman if she could identify the man from a photographic lineup. She chose defendant's photograph almost immediately and was quite certain of her identification. The officer then informed her that she had selected the photograph of the murder suspect. Several weeks later, the police called to inform Mrs. Wellman that the person she had selected, Mr. Wash, was in custody.

Timothy Gonser, the Wellmans' employee, saw the police and Mrs. Wellman working on the composite. He informed the police that he had also seen a man near the Sundial Ranch on the day in question. A few days later, the police returned and asked Gonser to view a photographic lineup. Although he focused initially on two photographs, he quickly selected one, that of defendant, as the man he saw on the road. After the police left, Gonser spoke with Mrs. Wellman. He could not recall exactly, but believed the police informed him that he and Mrs. Wellman had selected the same photograph. Several weeks later, the police called Mr. Gonser to clarify certain other information and informed him that the person he had chosen was in custody.

---

[9]Our conclusion that the electrophoretic analysis was properly admitted disposes of defendant's related claim that its use at the penalty phase requires reversal of the penalty verdict. Because of our conclusion, we also need not consider the effect, if any, of the recent United States Supreme Court decision downgrading the criteria for admissibility under *Frye* from strict requirements to simple guidelines under the Federal Rules of Evidence. (*Daubert* v. *Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. __ [125 L.Ed.2d 469, 113 S.Ct. 2786].)

Defendant argued at the suppression hearing that the photographic identifications were impermissibly suggestive in several respects. He claimed that defendant's photograph was substantially different from the other five photographs in the lineup.[10] He argued that informing Mrs. Wellman immediately after her selection that she had chosen the "right" photograph was improper. And he claimed that informing Gonser and Wellman several weeks later that the suspect was in custody was inappropriate.

At the conclusion of the evidentiary hearing, the trial court found that the lineups were not impermissibly suggestive and denied the motion. Both Mrs. Wellman and Mr. Gonser subsequently testified at trial about the circumstances of the photographic lineups and identified the photograph of defendant as the one they had selected. Neither made an in-court identification of defendant.

▆▆▆▆ Defendant renews his claim here that the photographic lineups were impermissibly suggestive. ▆▆▆▆ In deciding whether an extrajudicial identification is so unreliable as to violate a defendant's right to due process, the court must ascertain (1) "whether the identification procedure was unduly suggestive and unnecessary," and, if so, (2) whether the identification was nevertheless reliable under the totality of the circumstances. (*People* v. *Gordon* (1990) 50 Cal.3d 1223, 1242 [270 Cal.Rptr. 451, 792 P.2d 251].) ▆▆▆▆ As will appear, we find no error in the trial court's determination that no aspect of the identification was impermissibly suggestive.

Defendant first contends that Wellman and Gonser improperly collaborated in creating the Identikit picture, thereby influencing their individual selections during the subsequent photographic lineups. Defendant did not advance this argument at the suppression hearing and therefore may not raise it for the first time on appeal. (*People* v. *Sanders*, *supra*, 51 Cal.3d at p. 508.) In any event, the record discloses that Gonser merely encountered the police while they working with Mrs. Wellman on the composite. There is no evidence that he participated in the Identikit procedure or pooled his recollections with those of Mrs. Wellman. Accordingly, there is no merit to the claim that the subsequent identifications were tainted by the creation of the composite.

Defendant also renews his argument that defendant's photograph was substantially different from the others in the lineup shown to Mrs. Wellman. The trial court viewed the photographs and concluded otherwise. We have

---

[10]Defense counsel did not make clear at the suppression hearing whether he was referring to the photographic lineup viewed by Mrs. Wellman or Mr. Gonser. On appeal, he confines his claim to the lineup viewed by Mrs. Wellman.

independently scrutinized the photographs as well, and concur with the trial court's assessment. (*People* v. *Marquez* (1992) 1 Cal.4th 553, 572 [3 Cal.Rptr.2d 710, 822 P.2d 418].)[11] The lineup was not impermissibly suggestive in this regard.

Relying on *People* v. *Gordon, supra,* 50 Cal.3d 1223, defendant asserts that informing Mrs. Wellman she had selected the suspect's photograph, and later informing her that the suspect was in custody, tainted her subsequent trial testimony. *Gordon,* however, is not helpful to defendant's claim. There, the witness had stated that the suspect's photograph " 'looks familiar, but I'm not certain.' " Shortly thereafter, the police informed her that she had " 'picked the right person.' " (*Id.* at p. 1241.) We held that the trial court had properly barred any identification subsequent to the call, but that the witness could testify to her identification of the defendant before she spoke with the police. Here, the witness expressed no uncertainty about her initial identification. Moreover, at trial she merely identified the photo that she had selected from the lineup, which occurred before the confirming statements by the police. Accordingly, there is no possibility that her testimony was impermissibly influenced.

For similar reasons, we reject defendant's claim that informing Mr. Gonser he had selected the same person as Mrs. Wellman, and later informing him that the suspect was in custody, tainted his in-court identification. Mr. Gonser's trial testimony was confined to recounting the circumstances of the photographic lineup and identifying the photograph he selected, all of which occurred before any confirming comments by the police. Accordingly, there was no denial of due process. (*People* v. *Gordon, supra,* 50 Cal.3d at p. 1244.)[12]

### 4. *Crime Scene and Autopsy Photographs*

Defendant contends the trial court erroneously admitted five crime scene photographs and thirteen autopsy slides despite his objection that they were irrelevant and more prejudicial than probative. (Evid. Code, § 352.) Defendant also contends the court erred in permitting the victims' relatives to identify the bodies from two of the crime scene photographs.

The trial court did not abuse its discretion in admitting the slides. (*People* v. *Raley* (1992) 2 Cal.4th 870, 896 [8 Cal.Rptr.2d 678, 830 P.2d 712].) In

[11] Defendant claims that all of the photographs except defendant's depict men with straight or stringy blond hair, and that defendant's face appears larger and more distinct than the others. Our review of the lineup does not corroborate defendant's claim. All of the men depicted in the photographs are White; all have long hair in various shades from blond to brown; and all have beards. Defendant's photograph does not stand out from the others.

[12] Our conclusion disposes of defendant's related claim that the court erred in admitting the evidence of Mrs. Wellman's photographic identification at the penalty phase.

graphically illustrating the nature and placement of the victims' wounds, and the bound and partially disrobed state in which Erin King's body was discovered, the slides were plainly relevant to the prosecution's theory that the killings were deliberate and premeditated, and committed during the course of a rape. (*People* v. *Pride* (1992) 3 Cal.4th 195, 243 [10 Cal.Rptr.2d 636, 833 P.2d 643]; *People* v. *Wilson* (1992) 3 Cal.4th 926, 938 [13 Cal.Rptr.2d 259, 838 P.2d 1212].) Contrary to defendant's claim, the evidence was not unduly cumulative of the testimony of the crime scene expert and pathologist. "The prosecution was not obliged to prove these details solely from the testimony of live witnesses, and the jury was entitled to see how the physical details of the scene and body supported the prosecution theory . . . ." (*People* v. *Turner* (1990) 50 Cal.3d 668, 706 [268 Cal.Rptr. 706, 789 P.2d 887]; accord, *People* v. *Raley*, *supra*, 2 Cal.4th at p. 897.) Nor did the court err in concluding that the probative value of the evidence outweighed its prejudicial impact. Although " 'murder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant . . . .' " (*People* v. *Pierce* (1979) 24 Cal.3d 199, 211 [155 Cal.Rptr. 657, 595 P.2d 91]), we have independently reviewed the slides[13] and find that they were not unduly gruesome or inflammatory. (*People* v. *Pride*, *supra*, 3 Cal.4th at p. 243.)[14]

---

[13]The Alameda Superior Court was not able to locate the five crime scene photographs for this court's independent review. There is no dispute, however, regarding their accuracy and authenticity, nor is there any real uncertainty regarding the subject matter depicted. Defendant's description of the five challenged photographs, which the People have not disputed, is as follows: "The picture of Ms. Siegel shows her lying on the floor, eyes open, with bullet holes through her clothing. (People's Exhibit 4E.)" The four pictures of Ms. King are described as follows: "One picture shows Ms. King's head and shoulders with her head wrapped in a towel and tied with some cord. There is a gag in her mouth and blood on the bed sheets. (People's Exhibit 4L.) Another picture is a closeup of the same view. (People's Exhibit 4M.) A third picture is a rear view of Ms. King, showing her hands bound behind her back, her head wrapped in a towel, and her sweat pants partially pulled down. Numerous stab wound[s] are visible through her shirt and a bullet hole is visible in the towel. There is blood on her and on the sheets. (People's Exhibit 4N.) The last photo depicts Ms. King as viewed from the foot of the bed. (People's Exhibit 40.)"

We are unable to determine conclusively whether the five crime scene photographs were properly admitted because, as noted, the Alameda Superior Court was unable to locate them. But even if we were to assume that the photographs were improperly admitted, they clearly could not have prejudiced defendant in light of the overwhelming evidence establishing defendant's guilt relating to the murders of Erin King and Shelly Siegel.

[14]In his reply brief, defendant raises the additional "procedural" claim that in ruling on the motions to exclude the photographs and slides the trial court failed to weigh prejudice against probative value. As we have stated, "on a motion invoking [Evidence Code section 352] the record must affirmatively show that the trial judge did in fact weigh prejudice against probative value . . . ." (*People* v. *Green* (1980) 27 Cal.3d 1, 25 [164 Cal.Rptr. 1, 609 P.2d 468].) The record here does so. Defense counsel argued that the photographs of the crime scene depicting the victims were not relevant to the cause or manner of death. Although the trial court denied the motion without comment, it does appear from the record that he weighed

█ Defendant's additional claim that the court erred in permitting the identification of the victims has merit. Although defendant stipulated to the identification of the victims, the trial court permitted Ruth King and Philip Durbin to identify Erin and Shelly from their crime scene photographs. We have observed that the testimony of a parent to establish the identity of a murder victim may not be relevant if there is an offer to stipulate to the facts to be established by the testimony. (*People* v. *Bonin* (1989) 47 Cal.3d 808, 848-849 [254 Cal.Rptr. 298, 765 P.2d 460]; see also *People* v. *Raley, supra,* 2 Cal.4th at p. 896; *People* v. *Hendricks* (1987) 43 Cal.3d 584, 594 [238 Cal.Rptr. 66, 737 P.2d 1350]; cf. *People* v. *Garceau, ante,* 140, at pages 182-183 [24 Cal.Rptr.2d 664, 862 P.2d 664].) Nevertheless, we see no reasonable probability of prejudice here. The identification testimony of the relatives was factual and brief. There were no emotional outbursts. (See *People* v. *Raley, supra,* 2 Cal.4th at p. 896; cf. *People* v. *Pinholster* (1992) 1 Cal.4th 865, 959 [4 Cal.Rptr.2d 765, 824 P.2d 571].) Thus, the testimony "had no potential to inflame the jurors and hence could not have exposed defendant to prejudice." (*People* v. *Bonin, supra,* 47 Cal.3d at p. 849.)

## B. PENALTY PHASE ISSUES

### 1. *Double Jeopardy*

█ Defendant contends that state and federal principles of double jeopardy (Cal. Const., art I., § 15; U.S. Const., 5th Amend.) barred the penalty phase retrial because the trial judge declared a mistrial of the first penalty trial without the requisite legal necessity. As explained below, the contention lacks merit.

█ Discharging a jury without a verdict bars further prosecution unless the mistrial was granted for legal necessity or with the consent of the defendant. (*Curry* v. *Superior Court* (1970) 2 Cal.3d 707, 712 [87 Cal.Rptr. 361, 470 P.2d 345]; accord, *People* v. *Compton* (1971) 6 Cal.3d 55, 59 [98 Cal.Rptr. 217, 490 P.2d 537]; *Stone* v. *Superior Court* (1982) 31 Cal.3d 503, 516 [183 Cal.Rptr. 647, 646 P.2d 809]; see also *United States* v. *DiFrancesco* (1980) 449 U.S. 117, 130-131 [66 L.Ed.2d 328, 341-342, 101 S.Ct. 426].) "Such a legal necessity exists if, at the conclusion of such time as the court deems proper, it satisfactorily appears to the court that there is no reasonable

---

the relevant considerations. "Contrary to defendant's implication, no more is required. Certainly, the trial judge need not expressly weigh prejudice against probative value—or even expressly state that he has done so [citation]." (*People* v. *Mickey* (1991) 54 Cal.3d 612, 656 [286 Cal.Rptr. 801, 818 P.2d 84].) Moreover, subsequent to its initial ruling on the autopsy slides, the court explained that it had viewed the slides, that they "were fairly innocuous" in their portrayal of the victims, and were relevant as to the method used to perpetrate the killings.

probability that the jury can resolve its differences and render a verdict. Under these circumstances the court may properly discharge the jury and reset for trial." (*People* v. *Rojas* (1975) 15 Cal.3d 540, 545-546 [125 Cal.Rptr. 357 [542 P.2d 229, 92 A.L.R.3d 1127]; see also §§ 1140, 1141.) The determination of the jurors' state of mind, and whether further deliberations will result in a unanimous verdict, lies within the sound discretion of the trial judge in view of all the circumstances. (*Stone* v. *Superior Court*, *supra*, 31 Cal.3d at p. 522; *People* v. *Rojas*, *supra*, 15 Cal.3d at p. 546.)

The original penalty phase jury commenced deliberations on a Monday and continued through the week. On Wednesday, the trial court received a note from the jury stating that although they unanimously agreed the aggravating outweighed the mitigating factors, they disagreed over the penalty. The note stated: "We are at an impasse over the appropriateness of a penalty. Some of us have strong subjective, personal feelings (convictions) that the death penalty is appropriate; others have equally strong feelings (convictions) for life without parole. For these reasons it is inconcievable [*sic*] that we will ever reach a unanimous decision." The note was signed by all 12 jurors.

The same day, Wednesday, the jury foreman sent another note to the court stating as follows: "For moral & personal reasons, and disagreement over the relative severity of the two penalties, we are deadlocked 7 to 5. [¶] Prospects for a unanimous verdict seem virtually non-existent." The trial court apparently failed to inform counsel of the existence of the notes.

On Friday, two days later, the foreman sent out three additional notes. Two were apparently received sometime that morning. The first stated: "We are *deadlocked* about 7 to 5." (Original italics.) The second reflected some movement, but reaffirmed the jury's view that it was deadlocked, stating: "We are in disagreement (9 to 3). Prospects for a unanimous verdict are virtually nonexistent." Later that afternoon, the foreman sent the court a third note which stated as follows: "I feel that we gave it our best effort but are still in disagreement 9 to 3. [¶] There is no indication that movement is possible." A short time later, the court summoned the jury, acknowledged receipt of the three notes and, in the presence of counsel, questioned the foreman as follows: "Now, I have to ask you, I appreciate you have been deliberating for five days. Do you feel there is anything I can do in any way to help you in your deliberations, or have you reached a position where a verdict seems impossible?" The foreman responded: "I truly feel that we have reached a position where a verdict is impossible." The court then asked if there was any member of the jury who disagreed with the foreman. None indicated disagreement. Accordingly, the court declared a mistrial without objection.

Shortly after the case was set for retrial, it was discovered that the trial judge (Judge Golde) had engaged in ex parte communications with the jury during their penalty phase deliberations. Defendant, in response, filed a motion to dismiss the pending retrial on double jeopardy grounds. A hearing on the motion was held before Judge Wolters. One of the jurors from the first trial testified that Judge Golde had entered the jury room with neither counsel nor defendant present on two separate occasions during the penalty phase deliberations. During the first visit, the judge was asked to define life imprisonment and to explain the consequences of a hung jury. In response to the latter question, the judge explained that a hung jury would result in a new penalty trial. The jury also asked how long the judge would normally allow a jury to deliberate. The juror did not recall the judge's response.

The trial court's second ex parte contact with the jury occurred on Thursday, one day after receipt of the initial notes indicating a deadlock. On this occasion the jury reiterated its inability to reach a verdict and inquired again as to how long they would be required to deliberate. The judge stated that he would declare a mistrial if the jurors were unable to reach a verdict by Friday, the following day.

As noted earlier, the jury informed the court on Friday that it remained deadlocked and the trial court declared a mistrial. In response to a question from the deputy district attorney, the foreman indicated that the final vote was nine to three in favor of the death penalty.

At the conclusion of the hearing on defendant's double jeopardy motion, Judge Wolters ruled that although Judge Golde had acted improperly in contacting the jury, he had not abused his discretion in declaring a mistrial. Judge Wolters noted that the jury had indicated "quite strongly that it was deadlocked" before Judge Golde's improper contacts. Judge Wolters also rejected defendant's contention that the promise to declare a mistrial if the jury remained deadlocked on Friday improperly encouraged the jury to remain deadlocked or caused it to cease deliberations. Rather than establishing a deadline, Judge Wolter's observed, Judge Golde's statement could "just as readily be interpreted as an extension of time that the Judge would leave the jury out to deliberate . . . after it had effectively indicated that it could . . . in no way reach a verdict . . . ." Accordingly, Judge Wolters denied the motion to enter a plea of former jeopardy and dismiss the action.

Judge Wolter's ruling was correct. Although ex parte communications between court and jury are clearly improper and will not be condoned (*People* v. *Hawthorne* (1992) 4 Cal.4th 43, 69 [14 Cal.Rptr.2d 133, 841 P.2d 118]), the record does not substantiate defendant's claim that the trial court's

misconduct caused the deadlock or "derailed" the jury from its deliberative duties. On the third day of deliberations the jury sent a note informing the court that they were "at an impasse" and that it was "inconceivable" they would "ever reach a unanimous decision." This was followed by a second note stating, "Prospects for a unanimous verdict seem virtually non-existent." In light of these unequivocal statements, defendant's assertion that the court's subsequent ex parte communications improperly coerced a deadlock or encouraged the jury to cease deliberations is not credible. Indeed, the three notes on Friday indicate that the jury must have continued to deliberate; the first note stated that the vote was seven to five; the second and third notes described the vote as standing at nine to three. Clearly, the jury's reaffirmation at that point that the prospect of a unanimous verdict was "virtually nonexistent" and that no further "movement [was] possible" amply supports the trial court's finding that a unanimous verdict was not reasonably probable. (*People* v. *Rojas, supra,* 15 Cal.3d at p. 545.) The discharge of the jury was therefore supported by legal necessity, and defendant was properly retried. (*Ibid.; Stone* v. *Superior Court, supra,* 31 Cal.3d at p. 522.)

### 2. *Prosecutorial Discovery*

Before the start of the second penalty trial, the prosecutor moved for discovery of all materials reviewed by any expert whom defendant intended to call as a witness. Defense counsel objected that such compelled disclosure violated defendant's right against self-incrimination. Although counsel acknowledged that he had consulted with a psychologist, Dr. Seligman, counsel had not decided whether to call him as a witness and argued that disclosure of any matter upon which his opinions were based should be allowed, if at all, only after the experts had testified on direct examination. The trial court overruled counsel's objections and ordered disclosure of the requested materials at least two days before the expert's testimony.

On the first day of the defense case, the prosecutor renewed his motion. The trial court ordered the defense to produce the requested materials the next morning. Counsel complied, over objection, with the trial court's order, providing the notes of Dr. Seligman's conversations with defendant, his family and friends, as well as other documents the defense had submitted to the psychologist for review; these included notes and reports prepared by Dr. Fred Rosenthal, a psychologist who had testified for defendant at the first penalty trial.

Defense counsel ultimately decided not to call Dr. Seligman to testify. Nevertheless, the prosecutor subsequently referred to information in the discovered psychiatric materials during his cross-examination of Martha

Overbey, defendant's aunt. Specifically, he asked Ms. Overbey why she had told Dr. Seligman that defendant "felt anger towards his mother." Ms. Overbey responded, "The women that he murdered. Maybe this was something in [defendant] that came out at this time. I don't know. . . . I would have to be a psychologist to know." The prosecutor also confronted Ms. Overbey with her statement to Dr. Seligman that she was "not overly surprised" that "something like this might have happened." In addition, the prosecutor cross-examined Shelby Schaefer, a friend of defendant, about her comment to Dr. Seligman that defendant was looking for something "better from life." Later, during closing argument, the prosecutor referred to both Dr. Rosenthal and Dr. Seligman, asking why defendant had failed to call either psychologist to explain his conduct.

 The prosecution is clearly entitled to question an expert psychologist who testifies for the defense about the matters upon which his or her opinion is based, including a defendant's statements made to the expert. (*People* v. *Coleman* (1989) 48 Cal.3d 112, 151-152 [255 Cal.Rptr. 813, 768 P.2d 32]; Evid. Code, §§ 721, 1016.) Whether the prosecution may obtain discovery of these matters in advance of the expert's testimony, however, is a different question. Defendant, of course, contends that such discovery violates the accused's privilege against self-incrimination under the California Constitution, as interpreted by this court in *In re Misener* (1985) 38 Cal.3d 543 [213 Cal.Rptr. 569, 698 P.2d 637]), as well as his state and federal due process rights and a variety of evidentiary privileges. The Attorney General does not directly dispute defendant's legal contentions, but raises a practical consideration; advance disclosure of the materials which form the basis of an expert's opinion promotes the orderly progression of trial, by allowing the prosecutor to review the materials before the expert's testimony rather than in mid-examination, which may necessitate a continuance.

Defendant appears to be correct that the trial court's discovery order violated the principles set forth in *In re Misener*, *supra*, 38 Cal.3d 543. As we there stated: "While it may be true that by putting witnesses on the stand the defendant waives any right to object to their vigorous cross-examination by the prosecution, he does not waive his right to refuse to supply the prosecution with the means to conduct that cross-examination." (*Id.* at p. 557; see also *People* v. *Collie* (1981) 30 Cal.3d 43 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776] [defense may not be ordered to turn over the notes of conversations with defense witness]; *Bradshaw* v. *Superior Court* (1970) 2 Cal.3d 332 [85 Cal.Rptr. 136, 466 P.2d 680] [defense may not be compelled to furnish a statement of the expected testimony of defense witnesses].) Furthermore, even if the Attorney General's argument had

merit, it would apply only where the defense clearly intended to, and did in fact, call the expert in question; in that case, the court's order would affect only the timing, not the ultimate fact, of disclosure.[15] Here, however, the defense ultimately decided not to call the witness. Thus, the prosecution received an unwarranted windfall.[16]

Nevertheless, the error was plainly not prejudicial. The prosecutor made only a few passing references to the psychologist's notes, and none of the information was particularly harmful. Ms. Overbey's speculation that defendant's behavior may have been caused, in part, by anger toward his mother was consistent with her direct testimony that defendant was severely neglected by his parents. The same applies to her observation that she was not overly surprised something like this had happened. Ms. Schaefer's observation to Dr. Seligman that defendant was trying to find a better life was hardly damaging. Thus, we discern no reasonable possibility that the unwarranted disclosures had any effect on the verdict.

Defendant raises the related claim that the compelled disclosure violated his due process right to "reciprocal discovery" of similar information in the possession of the prosecution. However, it is undisputed that the prosecution provided defendant with complete discovery; defendant cites no evidence of any nature which was improperly withheld. Hence we perceive no violation of due process.

### 3. *Informing the Jury of the First Jury's Deadlock*

 Defendant next contends the trial court impermissibly restricted the scope of voir dire in violation of his constitutional rights to due process, a fair and impartial jury, and a reliable penalty verdict.

At the start of the penalty retrial, defense counsel requested the court to inform the prospective jurors that the first penalty trial had resulted in a hung jury and to specifically question them about their knowledge of the matter. Counsel stated that the request was motivated by two concerns: First, that the publicity surrounding the recent California Supreme Court retention

---

[15]Defendant's contention that he declined to call Dr. Seligman in part because of the court's discovery order is thus unpersuasive, since the matters on which the expert relied would have been disclosed in any event on cross-examination.

[16]The law governing prosecutorial discovery has of course changed significantly since the enactment in 1990 of Proposition 115, which added both constitutional and statutory provisions authorizing reciprocal discovery in criminal cases. (See *Izazaga* v. *Superior Court* (*1991*) 54 Cal.3d 356, 371 [285 Cal.Rptr. 231, 815 P.2d 304].) These provisions are not applicable here. (*Tapia* v. *Superior Court* (1991) 53 Cal.3d 282, 300 [279 Cal.Rptr. 592, 807 P.2d 434].)

election (in which three justices were not retained) might lead some jurors to mistakenly assume that defendant's prior death judgment had been reversed on a legal "technicality"; second, that several newspaper articles had revealed the first jury's vote to be nine to three in favor of death, which might prejudice certain jurors with this knowledge.

The trial court denied the motion, but emphasized that counsel could question the jurors generally as to whether they had heard or read anything about the case, and could follow up with specific questions if any indicated an awareness of the earlier hung jury. Counsel renewed the motion midway through voir dire after several jurors had referred to the recent Supreme Court election in response to questions about their views on the death penalty. The trial court again denied the motion.

In the seminal case of *People* v. *Williams* (1981) 29 Cal.3d 392, 407 [174 Cal.Rptr. 317, 628 P.2d 869], we held that counsel "should be allowed to ask questions reasonably designed to assist in the intelligent exercise of peremptory challenges . . . ." However, we also expressly left "intact the considerable discretion of the trial court to contain voir dire within reasonable limits." (*Id.* at p. 408; see also *People* v. *Edwards* (1991) 54 Cal.3d 787, 829 [1 Cal.Rptr.2d 696, 819 P.2d 436]; *People* v. *Visciotti* (1992) 2 Cal.4th 1, 48 [5 Cal.Rptr.2d 495, 825 P.2d 388].)

*Williams* cited with approval the case of *People* v. *Carmichael* (1926) 198 Cal. 534 [246 P. 62], overruled on other grounds in *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1086 [259 Cal.Rptr. 630, 774 P.2d 659]. (*People* v. *Williams, supra*, 29 Cal.3d at p. 403, fn. 4.) In *Carmichael*, the case on which defendant principally relies, the court held that the defendant was improperly denied the opportunity to question prospective jurors about their knowledge of the first jury's inability to reach a verdict. (198 Cal. at p. 543.) In so holding, however, the court emphasized that the more general questions put to the prospective jurors were inadequate to elicit this sort of information. Among these questions was whether the jurors had formed or expressed any opinion regarding the guilt or innocence of the defendant; whether they knew of any reason they could not give the defendant a fair and impartial trial; and whether they had talked with any witness or former juror in the case. (*Id.* at pp. 544-545.) As the court explained: "[A] juror in answer to a general question might state with perfect sincerity that he knew of no reason why he could not give the defendant a fair and impartial trial, but upon a further and more minute examination it might be shown that his conception of a fair and impartial trial for one who had been previously tried by a jury, ten of whom believed him guilty, differed in many material respects from that which the law accords to all persons accused of crime." (*Id.* at p. 545.)

Furthermore, the "answers of the jurors . . . that they had not talked with the former jurors or . . . a witness in the case did not necessarily show that they had not heard how the former jury stood . . . ." (*Id.* at p. 546.)

Here, in contrast, the general question sanctioned by the court, to wit, whether the prospective jurors had read or heard anything concerning the case, was designed to elicit precisely the sort of information which concerned counsel. If any prospective juror had indicated an awareness of the first jury's deadlock, counsel was expressly authorized to ask specific follow-up questions. The trial court's strategem thus avoided imparting the very information which might cause bias (awareness of the first jury's vote) while assuring counsel a reasonable opportunity to obtain a fair and impartial jury. (See *People* v. *Thompson, supra,* 50 Cal.3d at p. 178 [no sua sponte duty to inform second penalty phase jury of the first jury's deadlock].) We conclude, therefore, that the trial court properly exercised its discretion in disallowing the proposed instruction and questions concerning the hung jury.

Defendant makes a separate but related argument that the trial court erred in refusing counsel's request to inform the prospective jurors that the penalty retrial was not occasioned by an appellate *reversal* of an earlier death judgment. We rejected a similar claim in *People* v. *Edwards, supra,* 54 Cal.3d 787, observing, "We . . . have never suggested that the trial court is required to inform the jury of the history of the prior proceedings . . . ." (*Id.* at p. 845.) There, as here, the record disclosed no "basis even for speculation that the jury's verdict might have resulted from resentment over some presumed reversal by this court." (*Ibid.*) Accordingly, we hold that the court properly refused the requested instruction.

### 4. *Excusal of Jurors for Cause*

Defendant contends the trial court improperly excused five prospective jurors for cause because of their views regarding the death penalty.

A prospective juror may be excused for cause if his or her views on capital punishment would " 'prevent or substantially impair the performance of his [or her] duties as a juror . . . .' " (*Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 851-852, 105 S.Ct. 844]; *People* v. *Pinholster, supra,* 1 Cal.4th at p. 916.) Where a prospective juror's responses are equivocal or conflicting, the trial court's assessment of the juror's state of mind is generally binding. Where there is no inconsistency, but simply a question whether the juror's responses demonstrated a bias for or against the death penalty, the trial court's judgment will not be set aside if it is supported by substantial evidence. (*People* v. *Cooper, supra,* 53 Cal.3d at p. 809.)

Defendant claims that the "most egregious" errors concerned prospective jurors Williams and Rhoy. Although Williams initially denied she had any feelings about the death penalty that would affect her decision, under further questioning she stated that she would not under any circumstances impose death unless the defendant had a long history of prior violence. Defendant contends that it was improper to excuse Ms. Williams on this basis. However, in *People* v. *Pinholster*, *supra*, 1 Cal.4th 865, we upheld a trial court's decision to excuse a juror who stated that he would never vote for the death penalty in a burglary-murder case unless the killing was in fact premeditated. (*Id.* at p. 917.) There, as here, the question was not what the juror would do on the particular facts of the case (cf. *People* v. *Clark* (1990) 50 Cal.3d 583, 597 [268 Cal.Rptr. 399, 789 P.2d 127]), but rather what the juror would decide in the abstract regardless of the other evidence in aggravation. (*People* v. *Pinholster*, *supra*, 1 Cal.4th at pp. 917-918.) As in *Pinholster*, it is clear that Ms. Williams's rigid views would substantially impair her ability to follow the law and perform her duties. (*Wainwright* v. *Witt*, *supra*, 469 U.S. at p. 424 [83 L.Ed.2d at pp. 851-852].)

Prospective juror Rhoy's responses indicated a profound ambivalence concerning the death penalty. Although she ultimately acknowledged a willingness to vote for death "if the evidence was overwhelming," she consistently responded, "I don't know" in answer to the question whether she was capable of voting for death if all the evidence indicated that it was the appropriate sentence. As noted earlier, " '[W]here equivocal or conflicting responses are elicited regarding a prospective juror's ability to impose the death penalty, the trial court's determination as to his [or her] true state of mind is binding on an appellate court.' " (*People* v. *Breaux* (1991) 1 Cal.4th 281, 309-310 [3 Cal.Rptr.2d 81, 821 P.2d 585], quoting *People* v. *Ghent* (1987) 43 Cal.3d 739, 768 [239 Cal.Rptr. 82, 739 P.2d 1250]; accord, *People* v. *Hardy* (1992) 2 Cal.4th 86, 130 [5 Cal.Rptr.2d 796, 825 P.2d 781]; *People* v. *Cooper*, *supra*, 53 Cal.3d at p. 809.) Hence, we cannot find on this record that the trial court erred in excusing Ms. Rhoy.

Prospective juror Rosu also expressed acute ambivalence in her responses, repeatedly stating "I don't know" or "I can't tell you" in answer to the question whether she was capable of returning a verdict of death. Although at one point she expressed a willingness to impose the death penalty, her equivocal and conflicting answers clearly support the trial court's finding of substantial impairment. (*People* v. *Breaux*, *supra*, 1 Cal.4th at p. 309.)

Prospective juror Revak's testimony was a masterpiece of uncertainty concerning the death penalty. He initially stated that he considered death to be a viable sentencing option, but subsequently expressed doubts about its

"sense unless I was given proof that the death penalty provided [an] absolute deterrent." When pressed, he acknowledged that he was "confused" about the issue, and ultimately stated that he could not return a verdict of death. The trial court's judgment concerning the juror's state of mind is thus binding on review. (*People* v. *Breaux, supra,* 1 Cal.4th at p. 309.)

Finally, defendant challenges the trial court's decision to excuse prospective juror Moye. Although initially Ms. Moye stated that she could "see" herself voting for death, she subsequently expressed strong misgivings about capital punishment based on her religious beliefs. When asked whether she was "presently capable of voting for the death penalty," her response was an unequivocal "No." Under the circumstances, the record amply supports the trial court's determination that Ms. Moye's state of mind would substantially impair her ability to perform her duties as a juror. (*Wainwright* v. *Witt, supra,* 469 U.S. at p. 424 [83 L.Ed.2d at pp. 851-852].)

### 5. *Alleged Prosecutorial Misconduct*

Defendant alleges numerous instances of misconduct by the prosecutor during the second penalty trial. As will appear, defendant failed to object to most of the alleged misconduct, thereby waiving any error on appeal. (*People* v. *Green, supra,* 27 Cal.3d 1, 27.) Where counsel's omission forms the basis of a claim of ineffective assistance, we shall additionally address the merits.

### a. *Use of Taped Confessions and Slides*

Defendant initially complains that the prosecutor committed misconduct during his opening statement, when he played a portion of defendant's confession and simultaneously displayed slides, later admitted into evidence, of the crime scene and the two victims. While acknowledging that the tape and slides "may be otherwise admissible in evidence" (see discussion, *ante,* at pp. 245-246), defendant argues that their use in this manner exceeded the proper scope of an opening statement and inflamed the jury, in violation of his constitutional rights to a fair trial (*Donnelly* v. *DeChristoforo* (1974) 416 U.S. 637, 645 [40 L.Ed.2d 431, 437-438, 94 S.Ct. 1868]) and a reliable penalty verdict. (*Johnson* v. *Mississippi* (1988) 486 U.S. 578, 584-585 [100 L.Ed.2d 575, 583-584, 108 S.Ct. 1981].)

 Defendant failed to object to the use of the tape and slides on this basis. In the absence of an objection and request for a curative admonition, defendant may not be heard to complain of prosecutorial misconduct for the

first time on appeal. (*People* v. *Green, supra*, 27 Cal.3d at p. 27.) Accordingly, defendant has waived any claim of error.[17]

As to the merits, it is clear that the prosecutor committed no misconduct. "The purpose of the opening statement 'is to prepare the minds of the jury to follow the evidence and to more readily discern its materiality, force and effect' [citation], and the use of matters which are admissible in evidence, and which are subsequently in fact received in evidence, may aid this purpose." (*People* v. *Green* (1956) 47 Cal.2d 209, 215 [302 P.2d 307]; accord, *People* v. *Ramos* (1982) 30 Cal.3d 553, 575 [180 Cal.Rptr. 266, 639 P.2d 908].) Thus, it is well settled that the "use of photographs and tape recordings, intended later to be admitted in evidence, as visual or auditory aids is appropriate." (*People* v. *Fauber* (1992) 2 Cal.4th 792, 827 [9 Cal.Rptr.2d 24, 831 P.2d 249]; see *People* v. *Green, supra*, 47 Cal.2d at p. 215 [upholding use of photographs of murder victim during opening statement]; *People* v. *Kirk* (1974) 43 Cal.App.3d 921, 929 [117 Cal.Rptr. 345] [rejecting claim of prosecutorial misconduct based on use of taped admissions during opening statement].) Here both the taped confession and the photographs and slides were ultimately admitted into evidence. We find no error in connection with their use during the prosecutor's opening statement.

### b. *Cross-examination of Defendant*

 Defendant next contends the prosecutor committed misconduct during his cross-examination of defendant when he asked defendant: (1) to show how hard he hit Ms. Siegel with the posthole digger by striking a telephone book; (2) to demonstrate on a mannequin how he orally copulated Ms. King; and (3) to demonstrate on a styrofoam head how he tied and bound Ms. King. Defendant asserts that the requests unduly inflamed the jury in violation of his right to due process and his Eighth Amendment right to a reliable verdict. (*Johnson* v. *Mississippi, supra*, 486 U.S. at pp. 584-585 [100 L.Ed.2d at pp. 584-585].) However, defendant failed to object to the first request, and declined in any event to strike the book as the prosecutor requested. The trial court sustained defendant's objection to the second request and defendant refused the third request to show how he had bound the victim's head. Thus, regardless of the propriety of the prosecutor's questions, we discern no possibility of undue prejudice since none of the requested reenactments actually took place.

---

[17]Although defendant asserts that the alleged misconduct could not have been cured by a timely objection and admonition (*People* v. *Babbitt* (1988) 45 Cal.3d 660, 697 [248 Cal.Rptr. 69, 755 P.2d 253], cert. den. 488 U.S. 1034 [102 L.Ed.2d 981, 109 S.Ct. 849]), this is patently untrue, as a timely objection would have allowed the trial court to assess the alleged prejudice and exercise its discretion to exclude all or part of the materials from the prosecutor's opening statement.

### c. *Improper Questioning of Witnesses*

██ Defendant contends the prosecutor improperly elicited certain damaging information about defendant's background during cross-examination of two defense witnesses. In response to a defense motion, the trial court had forbidden the prosecutor to question defense witnesses about defendant's juvenile record. Nevertheless, during cross-examination of defendant's sister, Debra Burdine, the prosecutor elicited the fact that defendant had been in juvenile hall. Since defendant did not object to the question or ask for a curative admonition, the allegation of misconduct is not cognizable on appeal. (*People* v. *Green, supra*, 27 Cal.3d at p. 34.) Moreover, although it is plainly misconduct to ask questions calling for inadmissible answers (*People* v. *Bell* (1989) 49 Cal.3d 502, 532 [262 Cal.Rptr. 1, 778 P.2d 129]), we discern no possibility of prejudice resulting from one passing reference to defendant's juvenile record. The error, if any, could not have affected the verdict. (*People* v. *Bonin* (1988) 46 Cal.3d 659, 690 [250 Cal.Rptr. 687, 758 P.2d 1217].)

Defendant also contends the prosecutor improperly elicited certain information during cross-examination of defense witness Shelby Schaefer contrary to a court order excluding this evidence. The information in question included the fact that Schaefer had visited defendant in the hospital where he was recovering from a stabbing, that defendant had been expelled from a prison work-furlough program for drinking, and that defendant had quit welding school. Contrary to defendant's contention, the trial court did not grant counsel's motion to exclude the information, but simply reserved judgment until the witness's actual testimony. Defendant thereafter failed to specifically object to any of the prosecutor's questions. Accordingly, any claim of error is waived on appeal. (*People* v. *Green, supra*, 27 Cal.3d at p. 34.) Moreover, the questions were plainly within the scope of the witness's direct testimony and relevant to her credibility. (*People* v. *Cooper, supra*, 53 Cal.3d at p. 822.) Accordingly, we find no error.

Lastly, defendant asserts that the prosecutor "inflamed" the jury by asking John Ritesman, a government witness, whether he and defendant had ever viewed a program entitled "Blood Bath at Sundial Ranch." After a defense objection was sustained, the prosecutor asked Ritesman whether he had ever seen a show about "two women being butchered." Although the relevance of the questions is not altogether clear, we discern no possibility of their inflaming a reasonable juror. The brutality of the crimes was self-evident; the questions added nothing to the case.

### d. *Biblical References*

██ Defendant contends the prosecutor violated his constitutional rights to due process, a fair trial and a reliable penalty verdict by invoking biblical

authority in his closing argument.[18] However, as defendant failed to object to the remarks in question and request a curative admonition, the claim is not

---

[18]The prosecutor commenced his closing argument as follows: "Your honor, counsel, ladies and gentlemen: [¶] Thou shalt not kill. [¶] We all know what that means. We all know where it came from. The words have their plain evident English language meaning. [¶] I don't need to explain to you why such a rule ever came into existence or why we even have to have rules like this today. [¶] We have to because people do things like he's done and then the question is: What do we do to them for it? [¶] But before I get to that, before I talk about this case, I think it's important for you all to appreciate how we got to where we are today; starting with religious principles; starting with religious references, Biblical references. [¶] None of you had any religious reservations about serving on the jury like this. But I still feel it is important that you understand that what I'm going to ask you to do is totally in keeping with religious principles. It is totally in keeping with the Spirit of Christ or God or whatever beliefs you have. [¶] Every society has developed a rule like that and it's just been necessary whether they were tribes; whether they were major countries or small clans. [¶] There are references—it is something we could all accept—the Old Testament is full of references to the death penalty, full of references to the types of things that one should, could do and subject himself or herself to the death penalty. [¶] When Moses led the Jews out of the desert God gave him those commandments and those commandments were a combination of religious principles—because the Jews were out to start on their own and they had no more government; so they were a codification or recognition of both religious and civil principles. [¶] And that's why you see this mixture of religious commandments and civil. Or in this case criminal commandments: Thou shalt not kill. [¶] Clearly that was among them. [¶] There are references, as I mentioned[,] to that concept, the concept of thou shalt not kill and what happens if you do throughout the Old Testament: [¶] 'Anyone who strikes a man—' [¶] This is from the Book of Exodus. [¶] 'Anyone who strikes a man and so causes death must die.' [¶] Beastiality [*sic*], fornicating with an animal was punishable by death. [¶] The Book of Leviticus had a similar message or concept. [¶] The Book of Numbers: 'He who had struck a person with an iron object so as to cause death is a murderer and he must be put to death.' [¶] The same message was delivered with respect to striking somebody with a stone instrument, with a wooden instrument. [¶] Now those are all God's law. [¶] Those were not man's law. [¶] And the message was very clear in those days. [¶] There are people who feel that there are contrary messages coming from the Old or the New Testament. [¶] And rather [than] wait for [defense counsel] to point those out to you, I want to tell you what they are and why they are not contrary to where we are here today or where the Jews were when they got the message from Moses. [¶] An eye for an eye. You are all familiar with that. [¶] And many people think that the rejoinder to that was the idea that that was not to imply that you couldn't impose life punishment on somebody, was 'Vengeance is mine sayeth the Lord.' It's true that 'Vengeance is mine sayeth the Lord' seems to countermand, seems to offset the idea that an eye for an eye was the appropriate punishment. But that wasn't the point. [¶] Because when you read on subsequent to 'Vengeance is mine' it was clear that the message was: But you must submit to civil authorities. [¶] You must render unto Ceaser [*sic*] the things that are Ceaser's [*sic*]. [¶] The reason that when Jesus came on the scene and talked about love and compassion for human beings was that by that time the Romans had established the rule. The Romans had established the law and so it was fitting for him to deliver messages filled with compassion. It was fitting for him to talk about forgiveness. But it was also clear that it was proper to render to Ceaser [*sic*] the things that are Ceaser's [*sic*]. And those were the laws, in existence, at the time. [¶] God recognized there'd be people like Mr. Wash. That's why those commandments were delivered. That's why that message is throughout the Old Testament. [¶] Who must be punished for what they have done and if they have done things like he's done they must forfeit their lives for what he's done."

cognizable on appeal. (*People* v. *Hill, supra*, 3 Cal.4th at p. 1012; *People* v. *Poggi* (1988) 45 Cal.3d 306, 335 [246 Cal.Rptr. 886, 753 P.2d 1082].) Indeed, we note that defense counsel not only failed to object to the prosecutor's remarks, but countered them by citing a number of religious authorities to support his argument against the death penalty. (See *People* v. *Hill, supra*, 3 Cal.4th at p. 1012.)[19]

As to the merits of the claim, the Attorney General characterizes the extended passage in question as little more than a biblical "history" of the death penalty and therefore innocuous. (See *People* v. *Williams* (1988) 45 Cal.3d 1268, 1325 [248 Cal.Rptr. 834, 756 P.2d 221] [prosecutor's "short and fairly neutral 'history' of capital punishment" did not appeal to jurors' religious passions or prejudices].) It is true that the prosecutor here prefaced his remarks by observing, "[B]efore I talk about this case, I think it's important for you all to appreciate how we got to where we are today; starting with religious principles; starting with religious references, Biblical references." And much of the remainder of the challenged passage is indeed simply a catalogue of biblical references to the death penalty.

Nevertheless, the prosecutor's message was not only that capital punishment existed in the Bible, but that it was sanctioned by it, and by God. As the prosecutor stated, "[I]t is important that you understand that what I'm going to ask you to do is totally in keeping with religious principles. It is totally in keeping with the Spirit of Christ or God or whatever beliefs you have." And he concluded the passage by observing, "God recognized there'd be people like [defendant]. That's why those commandments were delivered. . . . Who must be punished for what they have done and if they have done things like he's done they must forfeit their lives . . . ."

This is precisely the sort of appeal to religious principles that we have repeatedly held to be improper. (See *People* v. *Sandoval* (1992) 4 Cal.4th 155, 193-194 [14 Cal.Rptr.2d 342, 841 P.2d 862], cert. granted on other issues Sept. 28, 1993, __ U.S. __ [125 L.Ed.2d 789, 114 S.Ct. 40]; *People* v.

---

[19]Defense counsel argued in this regard as follows: "You know, Mr. Harmon also told you the death penalty is proper under the laws of God. He reached back to the scriptures and he made a Biblical analysis. [¶] The truth is: The death penalty today is condemned by most religious beliefs. [¶] Pope John Paul the [Second] has condemned the death penalty[,] even as applied against the person who tried to take his life. [¶] Pope Paul the [Sixth] before him also spoke against the death penalty. [¶] The death penalty has been called immoral by the leaders in many churches. [¶] The National Counsel of Churches has taken a stand. Leaders in churches here in California and in synogogues [*sic*] throughout California have taken a stand against it. [¶] California Catholic Conference has taken a stand against it. . . '. [¶] So what do we make of this stand of the religious leaders? [¶] Well, clearly, it shows us that Mr. Harmon is wrong when he implies that God freely sanctions the execution of Mr. Wash. Others much closer to God than Mr. Harmon will surely disagree with that."

*Wrest* (1992) 3 Cal.4th 1088, 1107 [13 Cal.Rptr.2d 511, 839 P.2d 1020].) As we explained recently in *Sandoval*: "What is objectionable is reliance on religious authority as supporting or opposing the death penalty. The penalty determination is to be made by reliance on the legal instructions given by the court, not by recourse to extraneous authority." (4 Cal.4th at p. 194.)

Nevertheless, viewed in context we do not find the prosecutor's remarks here to be prejudicial. The primary vice in referring to the Bible and other religious authority is that such argument may "diminish the jury's sense of responsibility for its verdict and . . . imply that another, higher law should be applied in capital cases, displacing the law in the court's instructions." (*People* v. *Wrest, supra,* 3 Cal.4th at p. 1107; see also *People* v. *Sandoval, supra,* 4 Cal.4th at pp. 204-205 (conc. & dis. opn. of Mosk, J.) [arguing that the prosecutor's religious references had "minimize[d] the jury's responsibility" and "offered the jurors an easy way to avoid a hard choice"].) The prosecutor here invoked the Bible to demonstrate the legitimacy of capital punishment, and even implied that defendant deserved death under God's law: "God recognized there'd be people like Mr. Wash. . . . Who must be punished for what they have done. . . must forfeit their lives for what he's done." This was improper.

Following the passage in question, however, the prosecutor embarked upon a lengthy and detailed argument devoted exclusively to the evidence in aggravation, particularly the brutal circumstances of the rape and murders (§ 190.3, factor (a)) and defendant's prior convictions (§ 190.3, factor (c)). He did not return to the subject of God or religion, but instead urged a sentence of death based upon defendant's moral culpability for the crimes in light of the statutory factors. Thus, we do not believe the objectionable remarks could reasonably have diminished the jury's sense of responsibility, or displaced the court's instructions. (*People* v. *Wrest, supra,* 3 Cal.4th at p. 1107) There is no possibility that the jury would have reached a more favorable verdict had the misconduct not occurred. (*People* v. *Sandoval, supra,* 4 Cal.4th at p. 194.)

### e. *References to Extrinsic Matters*

Defendant contends the prosecutor improperly referred to a number of matters outside the record.

(i) First, he argues the prosecutor engaged in misconduct by urging the jury "to make a statement," to do "the right thing," and to restore

"confidence" in the criminal justice system by returning a verdict of death.[20] Relying on *People* v. *Ghent, supra,* 43 Cal.3d 739, defendant claims that the statements improperly deflected the jurors' attention from the facts of the case to external considerations about the "community-at-large." We have stated that "[i]solated, brief references to retribution or community vengeance . . . , although potentially inflammatory, do not constitute misconduct so long as such arguments do not form the principal basis for advocating the imposition of the death penalty." (*Id.* at p. 771; see also *People* v. *Anderson* (1990) 52 Cal.3d 453, 479-480 [276 Cal.Rptr. 356, 801 P.2d 1107].) The prosecutor's remarks here were not particularly inflammatory, nor did they constitute the principal basis of his argument in favor of the death penalty. Accordingly, any conceivable error was harmless.

(ii) Defendant also claims the prosecutor improperly referred to two psychologists who did not testify at trial. In his testimony at the penalty retrial, defendant denied that he went to the ranch with the intent to rob, rape and murder the victims. He explained the inconsistent admissions in his taped confession by stating that at the time of the interrogation he wanted to "seem as guilty as possible," that he "wanted to die." The prosecutor scorned this explanation during closing argument, stating: "Doesn't that sound like a psychiatrist or a psychologist could kind of say: Now, Jeff, isn't there some reason that you told them that? [¶] And you know, we've had a couple of guys lurking around in the background on this case, Dr. Rosenthal and Dr. Seligman. They were out talking to people, and then we never heard from them. [¶] And in this day and age in California, you know, where these guys are making a killing coming in charging the exorbitant fees testifying, it's kind of remarkable the only . . ." Defense counsel interposed an objection at that point which the trial court sustained, admonishing the jury that there was no evidence of anyone charging exorbitant fees. Shortly thereafter, however, the prosecutor returned to the subject, observing: "There's nothing wrong with him [defendant]; what have you heard that's wrong with him? [¶] There has been no . . . psychiatric or psychological testimony; even though people have been contacted from his family about that." Defense counsel's objection to this remark was overruled.

Inasmuch as neither expert testified at trial, their names should not have been invoked by the prosecutor during closing argument. ■ However,

---

[20]In this context, the prosecutor read a letter, over objection, from the father of a murder victim in an unrelated case, which stated: "There has been a furor in the media over the condition of our justice system, particularly juvenile justice. . . . But it is our hope that today's decision will bring back some of the confidence and trust that we in the community once had in this system." Defendant also notes that the prosecutor made passing reference to the media exposure surrounding the Larry Singleton case but does not appear to predicate error specifically on this basis.

prosecutorial comment upon a defendant's failure "to introduce material evidence or to call logical witnesses" is not improper. (*People* v. *Szeto* (1981) 29 Cal.3d 20, 34 [171 Cal.Rptr. 652, 623 P.2d 213]; *People* v. *Ratliff* (1986) 41 Cal.3d 675, 691 [224 Cal.Rptr. 705, 715 P.2d 665].) Thus, we do not find the prosecutor erred on the whole in observing that defendant had failed to adduce expert psychiatric testimony to support the claim that he was depressed and suicidal when he confessed to the crimes.

(iii) Defendant next asserts that the prosecutor improperly belittled the testimony of defendant's family and referred to matters outside the record by making several comments to the effect that, "There is not a death penalty case that goes on where members of the family won't come in." The trial court sustained defendant's objections and admonished the jury to disregard references to matters outside the record. We presume that the jury heeded the admonition and any error was cured. (*People* v. *Green, supra*, 27 Cal.3d at p. 29.) We discern no impropriety in the prosecutor's subsequent statement, "It shouldn't be surprising that a man's family could come in and beg you for his life . . . ." The statement was confined to defendant's own family, and was within the broad range of permissible comment on the evidence. (*People* v. *Frierson* (1991) 53 Cal.3d 730, 748 [280 Cal.Rptr. 440, 808 P.2d 1197].)

 Defendant raises a similar complaint about the prosecutor's reference to the mother of Erin King. Before describing the crimes, the prosecutor told the jurors, "I want you to realize one thing when I explain what I've proven. Erin's mother has never heard what happened to her daughter. This is going to be the first time she's heard what this man subjected her to." Although he now complains there was no record evidence of what the victim's mother knew of the crimes, defendant failed to object on this ground at trial. Accordingly, the issue is not cognizable on appeal. (*People* v. *Poggi, supra*, 45 Cal.3d at p. 335.)

Nor did the prosecutor impermissibly refer to matters outside the record or exceed the bounds of permissible comment in asking the jury to think about what "what was going through [the] mind" of the victim, Erin King; "did she think about Ruth, her mother, to whom she had just talked . . . . Did she think about her brother's undelivered birthday present? [¶] You know it was right there on the bed." As we explained in *People* v. *Lewis, supra*, 50 Cal.3d 262, rejecting a similar claim: "To the extent that the argument was inviting the jurors to put themselves in the shoes of the victim, we have found such an appeal appropriate at the penalty phase because there 'the jury decides a question the resolution of which turns not only on the facts, but on the jury's moral assessment of those facts as they reflect on whether defendant should be put to death. . . . In this process, one of the most significant considerations is the nature of the underlying crime. [Citation.] Hence assessment of

the offense from the victim's viewpoint would appear germane to the task of sentencing. [Citations.]" (*Id.* at pp. 283-284.) Moreover, we do not read the prosecutor's argument, taken as a whole, as urging the jury to subordinate reason to emotion. (*Id.* at p. 284.) There was no misconduct.

(iv) Defendant next complains that the prosecutor referred to certain "irrelevant" aspects of his personal life which the trial court had earlier excluded, including the fact that "he was in and out of juvenile custody," had been stabbed and hospitalized, had been ejected from a work-release program for drinking, and had violated parole. As noted earlier, the trial court excluded only the information relating to defendant's juvenile record. Moreover, all of the comments in question were sufficiently innocuous that a timely objection and request for admonition could have cured any possible harm. (*People* v. *Visciotti, supra,* 2 Cal.4th at p. 83; *People* v. *Poggi, supra,* 45 Cal.3d at p. 335.)

 (v) At the end of his closing argument, the prosecutor argued that life without possibility of parole was insufficient punishment because defendant would always have a "hope" of release: "As long as you are alive, there is hope. If you gave him life without parole, there'd always be hope in his mind[,] hope that there'd be a revolution and we free all the prisoners." Defense counsel objected and the prosecutor explained: "I'm not suggesting that the . . . possibility of life without parole means he might get out. [¶] I'm talking about what impact it will have on him in his mind. [¶] So any suggestion like the judge or [defense counsel] thought I was doing, that I'm trying to tell you that he might get out, that's not my point." The trial court responded, "All right," and the prosecutor repeated his plea to deny defendant any "hope that there will be a revolution and that all the prisoners will be freed, hope that this would all be a bad dream."

Defendant contends the prosecutor's remarks introduced irrelevant and prejudicial factors into the jury's consideration by referring to the possibility that defendant could be released on parole if he were not sentenced to death. (See *People* v. *Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430].) Although in some respects the prosecutor's remarks are similar to those which we recently held to be improper in *People* v. *Hill, supra,* 3 Cal.4th 959, there are differences here which make them even more clearly harmless than in *Hill.* There, the prosecutor referred to the defendant's hopes of a presidential pardon, as well as such unlikely scenarios as "earthquakes," "social revolutions," "wars" and "fantastical movie plots." (*Id.* at p. 1009.) A defense objection was overruled, and the impression that defendant might somehow be released was not immediately dispelled. Here, in response to a defense objection the prosecutor immediately made clear that he was "not

suggesting that the . . . possibility of life without parole means he might get out." Furthermore, as in *People* v. *Hill, supra,* 3 Cal.4th at page 1011, any lingering uncertainty was later dispelled by the trial court's specific instruction to assume that life without possibility of parole means that " 'the Defendant will be imprisoned for the rest of his life. . . . For you to conclude otherwise would be for you to rely on conjecture and speculation, and that would be a violation of your oath as trial jurors.' " Thus, we discern no possibility that the prosecutor's remarks affected the verdict.

### f. *Comments on Remorse*

■ During his closing argument, the prosecutor referred to a letter that defendant wrote in prison to his sister. Adverting to its contents, the prosecutor observed, "And I would have to admit that if this letter were full of compassion and recognition for the wrong he had done there'd be some meaning in here, something you'd really have to consider. . . . [[¶]] No remorse for his crimes. They are not mentioned at all. There is no compassion for the victims' family. They are not mentioned at all."

Defendant claims that the prosecutor's comments improperly invoked defendant's lack of remorse as an aggravating factor. Such an argument would have been improper. (*People* v. *Ashmus, supra,* 54 Cal.3d at p. 992.) However, as the comments themselves make clear, the prosecutor was merely observing that the letter provides no evidence in mitigation, that there was no "meaning," "nothing to consider," in the letter. It is proper to argue that remorse is lacking as a circumstance in mitigation. (*Id.* at pp. 992-993.) That is precisely what occurred here.

### g. *Derogatory Comments*

■ Defendant's final assignment of prosecutorial misconduct concerns certain remarks which allegedly cast aspersions on defense counsel and defense witnesses. (See *People* v. *Thompson* (1988) 45 Cal.3d 86, 112 [246 Cal.Rptr. 245, 753 P.2d 37].) As defendant failed to object to the remarks and request a curative admonition, the claim is waived on appeal. (*People* v. *Bell, supra,* 49 Cal.3d at pp. 537-538.) We find no prejudicial error in any event. Defendant cites two statements which allegedly implied that defense counsel had fabricated evidence. Recalling defendant's responses on cross-examination, the prosecutor observed, "Somebody must have told him, say 'I don't know' when you can't think of why [defendant committed the offenses]—don't say, 'Because I wanted to.' " We agree that the statement was arguably improper as suggesting that someone—presumably trial counsel—counseled defendant to feign a loss of memory. However, we discern no

possibility that this passing remark in the prosecutor's lengthy and detailed argument had any affect on the verdict.

Defendant also complains of the prosecutor's statement, referred to earlier, ridiculing defendant's explanation that he confessed because he wanted to die: "Doesn't that sound like a psychiatrist or a psychologist could kind of say: Now, Jeff, isn't there some reason that you told them that?" Apart from defendant's failure to object, we perceive no impropriety in the remark, which was well within the bounds of the kind of "vigorous argument a prosecutor is entitled to make." (*People* v. *Thompson, supra*, 45 Cal.3d at p. 125.)

We have reviewed the remaining statements which defendant contends denigrated counsel and find that none had the potential to deny defendant a fair trial, divert the jury from its proper role, or invite an irrational, purely emotional response. (*People* v. *Visciotti, supra*, 2 Cal.4th at p. 83.)[21]

### h. *Cumulative Impact*

Lastly, defendant contends that the cumulative effect of the prosecutor's misconduct compels reversal. We have identified only a few instances of misconduct, and have found them to be harmless. Viewed singly or in combination, there is no reasonable possibility that they affected the verdict.

### 6. *Photographs and Slides of Victims*

■ Defendant complains of the admission at the penalty phase of the same crime scene photographs and autopsy slides admitted at the guilt phase of trial. As defendant concedes, however, he failed to renew his objection at the penalty phase, thereby waiving any claim of error on appeal. (*People* v. *Frank* (1990) 51 Cal.3d 718, 734-735 [274 Cal.Rptr. 372, 798 P.2d 1215].) In any event, the trial court properly exercised its discretion in admitting the slides. As previously discussed, the evidence was relevant at the guilt trial to show malice, premeditation and deliberation. At the penalty trial, the evidence was also relevant to the issues of aggravation and penalty. "It demonstrated graphically the circumstances of the crime and therefore was relevant to a determination of the appropriateness of the death penalty." (*People* v. *Raley, supra*, 2 Cal.4th at p. 914; accord, *People* v. *Benson* (1990)

---

[21]Defendant complains of the following remarks: (1) "[Defense counsel] doesn't want you to know how long [the victim's mother] talked to her daughter" (referring to defense counsel's objection to the prosecutor's reference to certain phone records); (2) "It was an absurd question" (referring to counsel's questioning of Dr. Hermann); (3) "Now, in the jury selection and the questioning [defense counsel] have encouraged the idea of a hung jury."

52 Cal.3d 754, 785-786 [276 Cal.Rptr. 827, 802 P.2d 330]; *People* v. *Thompson, supra,* 50 Cal.3d at pp. 181-182.)[22]

As previously discussed (*ante*, p. 247), we agree with defendant that the trial court erred in permitting Philip Durbin to identify his wife's body in a crime scene photograph. (*People* v. *Bonin, supra,* 47 Cal.3d at pp. 848-849, 851-852.) Nevertheless, as noted earlier, the testimony was factual, had no potential to inflame a reasonable juror, and could not have exposed defendant to prejudice. (*Ibid.*)

### 7. *Evidence of Ms. King's Enlistment in the Army*

Defendant also contends the trial court erred in denying his motion to exclude evidence of Erin King's plans to enlist in the Army. Defendant asserts that the evidence was irrelevant to any proper sentencing consideration under section 190.3 and that its prejudice outweighed its probative value (Evid. Code, § 352).

During her testimony, Erin King's mother alluded to the fact that Erin discussed her plans to enlist in the Army in a telephone conversation shortly before the murders. Later, defendant also testified on direct examination that he talked with Erin about her plan to enlist, and he stated that Erin pleaded with him to leave her enough money to send her civilian clothes home to Washington. Thus, the subject was generally relevant to the circumstances of the crime (§ 190.3, factor (a)), and its admission was not improper. Defendant makes no showing that its prejudice outweighed its probative value.

### 8. *Alleged Boykin/Tahl Error*

Evidence of two prior convictions for burglary committed by defendant in Indiana were admitted into evidence during the penalty phase. Defendant burglarized a school, and, while on bail for this offense, committed a burglary of a Radio Shack store. He entered separate guilty pleas to both charges, pleading first to the Radio Shack burglary and then to the school burglary. While conceding that he was properly advised of his *Boykin/Tahl* rights (*Boykin* v. *Alabama* (1969) 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709]; *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449]) before pleading guilty to the school burglary, defendant argued below, and renews his claim here, that his plea to the Radio Shack burglary was invalid because he was not advised of his privilege against self-incrimina-

---

[22]Although, as previously noted at page 246, footnote 13, the photographs were not available for review, they could not possibly have prejudiced defendant in light of all the other properly admitted evidence at the penalty phase.

tion, and he asserts that the violation tainted his subsequent plea.[23] Accordingly, defendant contends that the admission of both priors was improper, and violated his rights to due process and a reliable penalty verdict.

■ A criminal defendant must be advised of the constitutional rights he or she waives—including the privilege against self-incrimination, the right to trial by jury and the right to confront one's accusers—when entering a plea of guilty, and may move to strike a prior conviction on the ground that such advisements were not given in the prior proceeding. (*People* v. *Wharton* (1991) 53 Cal.3d 522, 582 [280 Cal.Rptr. 631, 809 P.2d 290].) In such a case, the standard on review, as we recently explained in *People* v. *Howard* (1992) 1 Cal.4th 1132, 1178 [5 Cal.Rptr.2d 268, 824 P.2d 1315], is whether the record affirmatively demonstrates that the plea was voluntary and intelligent under the totality of the circumstances. Applying this standard, we held in *Howard* that the admission of a prior conviction was valid notwithstanding the omission of an explicit admonition concerning the privilege against self-incrimination. (*Id.* at p. 1180.) The trial court had specifically informed the defendant that he had the right to force the district attorney to

---

[23]The transcript of defendant's plea hearing on the Radio Shack burglary contains the following colloquy:

"[COURT]: Mr. Wash, I have to be assured and establish for the record that you are doing this of your own free will, that you know what you are doing and that you know the consequences of your plea, all right? How old are you sir?

"[WASH]: Twenty years.

"[COURT]: Do you read and write?

"[WASH]: Yes, sir.

"[COURT]: Did you read the plea agreement?

"[WASH]: Yes, sir.

"[COURT]: Are you under the influence of any drugs or alcohol today?

"[WASH]: No, sir.

"[COURT]: Do you think your plea is in your best interest?

"[WASH]: Yes.

"[COURT]: Do you understand by your plea that you are admitting the truth of the facts alleged in the Information, you are saying I am in fact guilty of a Class C Burglary?

"[WASH]: Yes, sir.

"[COURT]: Do you understand by your plea that you waive your right to a public and speedy jury trial by twelve people from this community who would sit in those red chairs and try your case?

"[WASH]: Yes, sir.

"[COURT]: In that connection do you understand that you are giving up your right to face your accusers and to cross examine them?

"[WASH]: Yes, sir.

"[COURT]: Do you understand that you are giving up your right to compel witnesses to come in here to testify on your behalf?

"[WASH]: Yes, sir.

"[COURT]: . . . Do you understand that if you were to go to trial the State of Indiana would have a duty to prove you guilty beyond a reasonable doubt, that you wouldn't have to do anything, and could remain silent and the burden would never shift to you?

"[WASH]: Yes, sir."

prove the prior conviction at trial, and that in such a trial he would have the right to a jury and to confront adverse witnesses. Defendant was represented by counsel, and there was a strong factual basis for the plea. (*Ibid.*) Thus, on the record, and in view of the totality of the circumstances, we concluded that the admission was voluntary and intelligent. (*Ibid.*)

 The record here similarly demonstrates that the absence of an express admonition and waiver concerning the privilege against self-incrimination did not render the plea any less voluntary and intelligent. The trial judge clearly advised defendant of his right to a jury trial and to confront the evidence against him, that the state had the burden of proving him guilty beyond a reasonable doubt, and that he could *remain silent* and the burden of proof would not shift to him. Thus, defendant was effectively apprised of the privilege against self-incrimination. Moreover, defendant indicated that he understood and freely waived these rights. Under the circumstances, we are satisfied that defendant's plea was voluntary and intelligent. (*People* v. *Howard, supra,* 1 Cal.4th at p. 1180.)

### 9. Ineffective Assistance of Counsel

Defendant contends he was denied effective assistance of counsel at the penalty phase in several respects.

 The standard for evaluating claims of ineffective assistance is well settled. To establish entitlement to relief, defendant must show: (1) trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates; and (2) it is reasonably probable that a more favorable determination would have resulted in the absence of counsel's failings. (*People* v. *Wrest, supra,* 3 Cal.4th 1088, 1114; *Strickland* v. *Washington* (1984) 466 U.S. 668, 687-696 [80 L.Ed.2d 674, 693-699, 104 S.Ct. 2052].)

 Defendant first claims that trial counsel failed adequately to investigate and present evidence of defendant's troubled upbringing and mental condition. He cites as evidence in this regard counsel's failure to call any expert witnesses. The record discloses that counsel consulted at least two psychologists, Dr. Seligman and Dr. Rosenthal. Dr. Seligman did not testify, and the record contains no reference to any evidence that he might have presented; therefore, "without engaging in speculation, we cannot infer anything about its existence, availability, or probative force, or the probable consequences of its use at trial." (*People* v. *Wrest, supra,* 3 Cal.4th at p. 1116.) Accordingly, there is no evidence to support defendant's claim of ineffective assistance in this regard.

Although he did not testify, the record is somewhat more revealing as to what evidence Dr. Rosenthal might have presented as an expert witness based on his testimony at the first penalty trial. There, he observed that defendant grew up in a crowded and chaotic family environment which contributed to a number of emotional problems. He also speculated that on the day of the murders defendant was probably in a turbulent emotional state from a lack of sleep and food, prior ingestion of alcohol and drugs, and a sense of isolation from friends and family. However, Dr. Rosenthal acknowledged that defendant was not insane, did not suffer from any discrete mental disease and knew what he was doing when he committed the crimes.

Much of the substance of Dr. Rosenthal's prior testimony concerning defendant's troubled family background was presented at the second penalty trial by other witnesses, including several of defendant's family members and friends. As to the evidence of defendant's mental health, Dr. Rosenthal's prior testimony was, on the whole, rather pallid and apologetic. Several times he emphasized that he was not trying to condone or excuse defendant's conduct, but merely to "show . . . the emotional aspects that might also be involved in leading someone to do these things." Counsel's decision to forgo such testimony represented a valid tactical choice. (*People* v. *Wrest, supra*, 3 Cal.4th at p. 1115; *Darden* v. *Wainwright* (1986) 477 U.S. 168, 186 [91 L.Ed.2d 144, 160-161, 106 S.Ct. 2464].) Nor may we fault counsel for failing to find other experts to present more favorable testimony. "Competent representation does not demand that counsel seek repetitive examinations of the defendant until an expert is found who will offer a supportive opinion." (*People* v. *Williams* (1988) 44 Cal.3d 883, 945 [245 Cal.Rptr. 336, 751 P.2d 395]; accord, *People* v. *Payton* (1992) 3 Cal.4th 1050, 1078 [13 Cal.Rptr.2d 526, 839 P.2d 1035].)

 Defendant also contends that trial counsel rendered constitutionally deficient representation in failing to impeach the testimony of Ruth King, Erin King's mother. At the penalty retrial, Mrs. King recalled a telephone conversation with her daughter on the day of the murders. Just before disconnecting, she heard a voice say, "Who are you? What do you want?" and "Stop." She also heard someone say, "Stop it. You're hurting me," and a muffled male voice reply, "Shut up. Just shut up." During cross-examination, defense counsel asked Mrs. King why she had not mentioned hearing "anything like a man's voice or the rest of this conversation" in her testimony at the guilt phase. Mrs. King responded that she thought she had.

Defendant now contends that counsel was negligent in failing to impeach Mrs. King with her testimony from the guilt trial. There, she testified that just before disconnecting she heard "some background noises, voices" but

could not make out any definite words. Although counsel might have impeached Mrs. King more thoroughly by referring to her earlier testimony, we are not persuaded that the decision to forgo such impeachment was negligent. The benefits of such impeachment were minimal, as the evidence plainly showed that defendant broke into Erin's trailer while she was on the telephone, grabbed her by the neck, tied her up, took her money, raped her and brutally stabbed and shot her to death. Moreover, this was the last time the victim's mother ever spoke to her daughter. Thus, counsel could well have made a tactical choice not to press a relatively minor inconsistency at the risk of upsetting the witness and antagonizing the jury. In any event, we perceive no reasonable probability that counsel's decision had any effect on the verdict. (*People* v. *Wrest, supra*, 3 Cal.4th at p. 1116.)

Finally, defendant contends that trial counsel rendered ineffective assistance in failing to object to several instances of alleged prosecutorial misconduct, including the use of crime scene slides and defendant's taped confession during his opening statement, a request that defendant demonstrate how hard he hit Ms. Siegel, references to the Bible and the community at large during closing argument, appeals to sympathy for the victims, and personal attacks on defense counsel, as well failing to object to the use of crime scene photographs and autopsy slides at the penalty phase. As previously discussed (*ante*, pp. 258-261), however, the only allegation of any substantial merit—the prosecutor's improper references to religion and the Bible—was not reasonably likely to have diminished the jury's sense of sentencing responsibility or to have displaced the court's instructions. Thus, there is no reasonable probability that counsel's omission resulted in a less favorable verdict.

Accordingly, we reject defendant's assertion that defense counsel's overall performance was so deficient as " 'to undermine confidence in the outcome.' " (*In re Cordero* (1988) 46 Cal.3d 161, 180 [249 Cal.Rptr. 342, 756 P.2d 1370].)

### 10. *Constitutionality of Death Penalty*

In supplemental briefing, defendant raised a host of challenges to the constitutionality of the death penalty statute, both on its face and as applied. We have previously considered and rejected these arguments. (*People* v. *Zapien* (1993) 4 Cal.4th 929, 990 [17 Cal.Rptr.2d 122, 846 P.2d 704] [failure to characterize the penalty factors as aggravating or mitigating does not render the statute unconstitutional]; *People* v. *Alcala* (1992) 4 Cal.4th 742, 809 [15 Cal.Rptr.2d 432, 842 P.2d 1192] [jury need not be instructed to find that the aggravating outweigh the mitigating circumstances beyond a reasonable doubt]; *People* v. *Payton, supra*, 3 Cal.4th at p. 1075 [proportionality

review is not constitutionally compelled]; *People* v. *Wright* (1990) 52 Cal.3d 367, 445-446 [276 Cal.Rptr. 731, 802 P.2d 221] [trial court need not give instruction clarifying what is meant by the nature and circumstances of the offense]; *People* v. *Fauber, supra,* 2 Cal.4th at p. 859 [jury need not file written findings as to which aggravating factors they relied on in reaching a verdict]; *People* v. *Keenan* (1988) 46 Cal.3d 478, 505 [250 Cal.Rptr. 550, 758 P.2d 1081] [district attorney discretion in deciding whether to seek the death penalty is not unconstitutional].)

## III. Disposition

The judgment is affirmed in its entirety.

Lucas, C. J., Panelli, J., Baxter, J., and George, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur in the judgment insofar as it affirms the judgment of the superior court as to guilt, death eligibility, and noncapital sentence. After review, I have found no reason to do otherwise.[1]

I dissent, however, from the judgment insofar as it affirms the judgment of the superior court as to the sentence of death. As I shall explain, the prosecutor committed prejudicial misconduct bearing on this question.

### I

In summation at the penalty phase, the prosecutor urged the jury to impose the penalty of death on defendant. Like William Jennings Bryan in the Scopes trial, he brought a Bible into the courtroom before his argument and kept it visible on counsel table throughout. He opened with these comments:

"Thou shalt not kill.

"We all know what that means. We all know where it came from. The words have their plain evident English language meaning.

"I don't need to explain to you why such a rule ever came into existence or why we even have to have rules like this today.

---

[1]This is not to say that I approve of all that the record discloses. Quite the contrary. I am especially critical of Detective Little's interrogation of defendant, which was violative of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], and its progeny. Defendant's statement, "I don't know if I wanna talk anymore since it's someone killed, you know," seems an invocation of his right to remain silent. Certainly, Detective Little so understood the words. His response, "Don't you like, uh, I thought you said that you liked Shelley?" and "Well, don't you wanna help, uh, with that?," did not constitute a proper attempt to obtain clarification of defendant's statement but an improper— and successful—attempt to secure its withdrawal.

"We have to because people do things like he's done and then the question is: What do we do to them for it?

"But before I get to that, before I talk about this case, I think it's important for you all to appreciate how we got to where we are today; starting with religious principles; starting with religious references, Biblical references.

"None of you had any religious reservations about serving on the jury like this. But I still feel it is important that you understand that what I'm going to ask you to do is totally in keeping with religious principles. It is totally in keeping with the Spirit of Christ or God or whatever beliefs you have.

"Every society has developed a rule like that and it's just been necessary whether they were tribes; whether they were major countries or small clans.

"There are references—it is something we could all accept—the Old Testament is full of references to the death penalty, full of references to the types of things that one should, could do and subject himself or herself to the death penalty.

"When Moses led the Jews out of the desert God gave him those commandments and those commandments were a combination of religious principles—because the Jews were out to start on their own and they had no more government; so they were a codification or recognition of both religious and civil principles.

"And that's why you see this mixture of religious commandments and civil. Or in this case criminal commandments: Thou shalt not kill.

"Clearly that was among them.

"There are references, as I mentioned to that concept, the concept of thou shalt not kill and what happens if you do throughout the Old Testament:

" 'Anyone who strikes a man—[']

"This is from the Book of Exodus.

" 'Anyone who strikes a man and so causes death must die.'

"Beastiality [sic], fornicating with an animal was punishable by death.

"The Book of Leviticus had a similar message or concept.

"The Book of Numbers: 'He who had struck a person with an iron object so as to cause death is a murderer and he must be put to death.'

"The same message was delivered with respect to striking somebody with a stone instrument, with a wooden instrument.

"Now those are all God's law.

"Those were not man's law.

"And the message was very clear in those days.

"There are people who feel that there are contrary messages coming from the Old or the New Testament.

"And rather [than] wait for [defense counsel] to point those out to you, I want to tell you what they are and why they are not contrary to where we are here today or where the Jews were when they got the message from Moses.

"An eye for an eye. You are all familiar with that.

"And many people think that the rejoinder to that was the idea that that was not to imply that you couldn't impose life punishment on somebody was 'Vengeance is mine sayeth the Lord.'

"It's true that 'Vengeance is mine sayeth the Lord' seems to countermand, seems to offset the idea that an eye for an eye was the appropriate punishment. But that wasn't the point.

"Because when you read on subsequent to 'Vengeance is mine' it was clear that the message was: But you must submit to civil authorities.

"You must render unto Ceaser [sic] the things that are Ceaser's [sic].

"The reason that when Jesus came on the scene and talked about love and compassion for human beings was that by that time the Romans had established the rule. The Romans had established the law and so it was fitting for him to deliver messages filled with compassion. It was fitting for him to talk about forgiveness. But it was also clear that it was proper to render to Ceaser [sic] the things that are Ceaser's [sic]. And those were the laws, in existence, at the time.

"God recognized there'd be people like Mr. Wash. That's why those commandments were delivered. That's why that message is throughout the Old Testament.

"Who must be punished for what they have done and if they have done things like he's done they must forfeit their lives for what he's done."

The prosecutor then turned to the facts of the case. He did not renounce his religious theme. In the course of his argument, he returned to the Bible, once expressly and several times by implication. Moreover, he kept the Bible itself on counsel table for all to see.

## II

In my concurring and dissenting opinion in *People* v. *Sandoval* (1992) 4 Cal.4th 155, 200-201, 204 [14 Cal.Rptr.2d 342, 841 P.2d 862], certiorari granted September 28, 1993, *sub nomine Sandoval* v. *California* (1993) __ U.S. __ [125 L.Ed.2d 789, 114 S.Ct. 40], I set out the law that is applicable to the facts of this case. I paraphrase as follows:

It is misconduct for a prosecutor to invoke purported religious law in support of the imposition of the penalty of death.

Argument of this sort by a representative of the state offends California statutes and judicial decisions, which establish our positive, secular law as the rule governing the choice between life and death. It also violates the United States and California Constitutions—including their respective clauses concerning establishment of religion, cruel and unusual punishments, and due process of law.

It is well settled that religion may not play a role in the sentencing process.

The jury has a duty to apply the law of the jurisdiction as given by the court in determining whether the defendant should live or die. It may not rely on its own interpretation of that law. Less still may it rely on religious precepts.

The invocation of the command of extrajudicial "law," no matter how well intentioned, is not permitted.

Indeed, the use of an extrajudicial "code" cannot be reconciled with the Eighth Amendment's requirement that any decision to impose death must be the result of discretion that is carefully and narrowly channeled and circumscribed by the law of the jurisdiction—the *secular* law of the jurisdiction.

The Bible, of course, is an extrajudicial "code." Its commands and prohibitions cannot be viewed as mere reliquiae of a culture separated from ours by thousands of miles and thousands of years. This is because, to many jurors, the Bible is an authoritative religious document.

As stated, prosecutorial misconduct involving the invocation of purported religious law in support of the imposition of the penalty of death implicates both California law and the United States Constitution. It is the general rule for error under California law that reversal requires prejudice and prejudice in turn requires a reasonable possibility of an effect on the outcome when, as here, the defect bears on penalty in a capital trial. Similarly, it is the general rule for error under the United States Constitution that reversal requires prejudice and prejudice in turn is presumed unless the government shows that the defect was harmless beyond a reasonable doubt. The sort of prosecutorial misconduct identified above appears to be subject to the general rule. Thus, insofar as state law is concerned, the "reasonable possibility" standard is applied. Insofar as the federal charter is involved, the "reasonable doubt" test is employed.

## III

The question that arises as we turn to apply the law stated above to the facts of this case is whether the prosecutor committed prejudicial misconduct by making the comments quoted in the text.

Before we may reach the merits, however, we must cross the threshold.

It is evident that defendant did not raise at trial, and has not preserved for appeal, a claim of prosecutorial misconduct. He failed to satisfy the general rule (e.g., *People* v. *Ashmus* (1991) 54 Cal.3d 932, 976 [2 Cal.Rptr.2d 112, 820 P.2d 214]) requiring assignment of misconduct and request for admonition as to the comments he now challenges, and can invoke no exception. Therefore, he has "waived" the question.

But "[t]hat means only that [defendant] is not entitled to require that we review the point as a matter of right. It does *not* mean that we are somehow barred from undertaking such review *ex mero motu*. Plainly, albeit impliedly, the California Constitution obligates us to reverse a judgment that results from a miscarriage of justice. Any rule of less than constitutional stature that may be construed to prevent us from discharging our duty [citations] is invalid to that extent." (*People* v. *Hill* (1992) 3 Cal.4th 959, 1017, fn. 1 [13 Cal.Rptr.2d 475, 839 P.2d 984], italics in original (conc. opn. of Mosk, J.).) The majority are not to the contrary: they reach the merits themselves.

My conclusion is not remarkable. In fact, it is strictly in line with the widely applicable and well-established doctrine of "plain error." Almost all jurisdictions, state and federal, "recognize the authority of an appellate court to reverse on the basis of a plain error even though that error was not

properly raised and preserved at the trial level." (3 LaFave & Israel, Criminal Procedure (1984) Scope of Appellate Review, § 26.5(d), p. 255.) Rule 52(b) of the Federal Rules of Criminal Procedure is a typical statement of the doctrine: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

The purpose of the "plain error" doctrine is broad. To be sure, "[t]here is language in a number of cases saying that the power to notice plain error is to be exercised only when this is necessary to prevent a clear miscarriage of justice. This seems too restrictive. [[¶]] Clearly a part of the purpose of the plain error rule is to protect the defendant. If a serious injustice was done him it should be remedied. . . . But this does not exhaust the purpose of the rule. Instead the court is to act if there were errors that 'seriously affect the fairness, integrity, or public reputation of judicial proceedings.' It is important that justice be done but it is also important that justice seem to be done. 'Even those guilty of the most heinous offenses are entitled to a fair trial.' It is not a miscarriage of justice to convict a guilty man, but if he is convicted in a way inconsistent with the fairness and integrity of judicial proceedings, then the courts should invoke the plain error rule in order to protect their own public reputation." (3A Wright, Federal Practice & Procedure (2d ed. 1982) § 856, pp. 338-341, fns. omitted [dealing with Fed. Rules Crim.Proc., rule 52(b), 18 U.S.C.].)

It hardly needs to be stated that the "power to notice a plain error . . . is one that the courts exercise"—and should exercise—"cautiously and only in exceptional circumstances." (3A Wright, Federal Practice & Procedure, *supra*, § 856, p. 338, fn. omitted [dealing with Fed. Rules Crim. Proc., rule 52(b), 18 U.S.C.].) For example, "federal courts have consistently interpreted the plain-error doctrine as requiring an appellate court to find that the claimed error not only seriously affected 'substantial rights,' but that it had an unfair prejudicial impact on the jury's deliberations." (*United States* v. *Young* (1985) 470 U.S. 1, 17, fn. 14 [84 L.Ed.2d 1, 13-14, 105 S.Ct. 1038] [same].) If we should follow such an interpretation here, we would find what it requires. The analysis below will prove the point.

On the very face of the record, it is manifest that the prosecutor engaged in misconduct. The majority agree.

In comments that were plain, vigorous, and extensive, the prosecutor invoked purported religious law in support of the imposition of the penalty of death on defendant. The thrust of his remarks was that "God recognized there'd be people like Mr. Wash"—and that God decreed such people must be put to death. Both the tone and content of his words were unmistakable.

Time and again, he referred to "God" and "Jesus" and "Christ"; mentioned the "Bible" and its "Books" and the "Old" and "New" "Testaments"; spoke of "Biblical" and "religious" "references" and "principles"; directed attention to "Moses" and "the Jews"; cited "God's law" and "commandments"; referred to the Bible's injunction of "an eye for an eye" and its "message" that the murderer must suffer death; and quoted and requoted and quoted again, "Thou shalt not kill," "Thou shalt not kill," "Thou shalt not kill."

It is also manifest that the prosecutor's misconduct requires reversal. The majority disagree. Their conclusion, however, must yield to the facts.

The only issue before the jury was whether to impose on defendant the penalty of death or life imprisonment without possibility of parole. The evidence was substantial both in aggravation and in mitigation. Indeed, similar evidence had previously resulted in a mistrial, as the original jury was unable to reach a verdict after five days of deliberation, standing ultimately with three jurors holding out for life.

Obviously, the prosecutor's comments invoking purported religious law in favor of death bore directly on the question of penalty. Just as obviously, his remarks must have carried special force, "incorporating as [they] did 'what many consider an authoritative source—if not Authority Itself.' " (*People* v. *Sandoval*, *supra*, 4 Cal.4th at p. 205 (conc. & dis. opn. of Mosk, J.).)

It is true that the prosecutor's comments were delivered at the opening of his summation and were followed by a review of the facts of the case. But the effect of his remarks perdured. As noted, he returned to the Bible in the course of his argument, and kept the Bible itself on counsel table for all to see.

It is also true that the prosecutor's comments were challenged by defense counsel in his own summation.[2] But despite counsel's efforts they were not neutralized.

---

[2] "You know, [the prosecutor] . . . told you the death penalty is proper under the laws of God. He reached back to the scriptures and he made a Biblical analysis.

"The truth is: The death penalty today is condemned by most religious beliefs.

"Pope John Paul the II has condemned the death penalty; even as applied against the person who tried to take his life.

"Pope Paul the VI before him also spoke against the death penalty.

"The death penalty has been called immoral by the leaders in many churches.

"The National Counsel [*sic*] of Churches has taken a stand. Leaders in churches here in California and in synogogues [*sic*] throughout California have taken a stand against it.

"California Catholic Conference has taken a stand against it.

". . . . . . . . . . . . . . . . . . . . . . . .

"So what do we make of this stand of the religious leaders?

"Well, clearly, it shows us that [the prosecutor] is wrong when he implies that God freely

Therefore, the misconduct raises a reasonable possibility of an adverse effect on the outcome, and cannot be declared harmless beyond a reasonable doubt.

In view of the foregoing, we may—and indeed must—reach the merits of the "waived" question whether the prosecutor committed prejudicial misconduct and, in so doing, resolve the issue in the affirmative. Our failure to act would subvert both justice and the appearance of justice. This is certainly an egregious case that calls for our intervention. As explained, the prosecutor's comments "seriously affected 'substantial rights[ ]' " enjoyed by defendant, including his federal and state constitutional guaranties concerning establishment of religion, cruel and unusual punishments, and due process of law, and must be held to have had an "unfair prejudicial impact on the jury's deliberations." (*United States* v. *Young*, *supra*, 470 U.S. at p. 17, fn. 14 [84 L.Ed.2d at pp. 13-14].)

## IV

For the reasons stated above, I would set aside the sentence of death.

**KENNARD, J.,** Concurring and Dissenting.—I join the majority in affirming the judgment of conviction and the special circumstances findings in this case. I dissent, however, as to penalty.

I conclude that the penalty cannot be upheld in this case because of egregious prosecutorial misconduct and ineffective assistance of defense counsel at the penalty phase of defendant's trial. Here, in closing argument the prosecutor improperly urged the jury to sentence defendant to death based on a letter written by the father of a crime victim in an unrelated case, and relied extensively on biblical sources to persuade the jury that defendant deserved the penalty of death. Defense counsel inexcusably failed to object to the prosecutor's clear and serious misconduct in urging a religious basis for the jury's decision. The combined effect of these errors undermines any reasonable confidence that absent these errors, defendant—whose first penalty phase trial, without these errors, had ended in a hung jury—would have been sentenced to death.

## BACKGROUND

Defendant was a ranch hand at the Sundial Ranch near Livermore from November 1983 to February 1984. The ranch was run by Shelly Siegel and

---

sanctions the execution of Mr. Wash. Others much closer to God than [the prosecutor] will surely disagree with that."

her husband, Philip Durbin. After defendant quit work at the ranch, he discussed with a friend a plan to return to the ranch and rob and shoot the occupants.

When, on March 23, 1984, Philip Durbin returned to the ranch from a two-day business trip, he discovered the bodies of his wife and the ranch hand who had replaced defendant, 19-year-old Erin King. Both had been shot to death. King had also been raped and repeatedly stabbed. Various items were missing. Fingerprints and electrophoretic semen evidence tied defendant to the crimes. Defendant was arrested and eventually confessed.

## DISCUSSION

### 1. *Argument Based on Biblical Principles*

The prosecutor began his closing argument with a lengthy discussion (three and one-half transcript pages) of biblical religious principles as they related to the death penalty.

The prosecutor began with the words, "Thou shalt not kill." He quoted from the Book of Exodus, the Book of Leviticus and the Book of Numbers as supporting capital punishment. The prosecutor summarized his religious discussion this way: "God recognized there'd be people like Mr. Wash. That's why those commandments were delivered. That's why that message is throughout the Old Testament. [¶] Who must be punished for what they have done and if they have done things like he's done they must forfeit their lives for what he's done."[1]

This argument was severe misconduct. As this court has recently and unanimously stated, a prosecutor's "reference to Old Testament support for

---

[1]The complete text of the prosecutor's religious argument is as follows:

"Your honor, counsel, ladies and gentlemen: [¶] Thou shalt not kill. [¶] We all know what that means. We all know where it came from. The words have their plain evident English language meaning. [¶] I don't need to explain to you why such a rule ever came into existence or why we even have to have rules like this today. [¶] We have to because people do things like he's done and then the question is: What do we do to them for it? [¶] But before I get to that, before I talk about this case, I think it's important for you all to appreciate how we got to where we are today; starting with religious principles; starting with religious references, Biblical references. [¶] None of you had any religious reservations about serving on the jury like this. But I still feel it is important that you understand that what I'm going to ask you to do is totally in keeping with religious principles. It is totally in keeping with the Spirit of Christ or God or whatever beliefs you have. [¶] Every society has developed a rule like that and it's just been necessary whether they were tribes; whether they were major countries or small clans. [¶] There are references—it is something we could all accept—the Old Testament is full of references to the death penalty, full of references to the types of things that one should, could do and subject himself or herself to the death penalty. [¶] When Moses led the Jews out of the desert God gave him those commandments and those commandments were a combination of religious principles—because the Jews were out to start on their own and they

capital punishment [is] improper—such an argument tends to diminish the jury's sense of responsibility for its verdict and to imply that another, higher law should be applied in capital cases, displacing the law in the court's instructions. (See, e.g., *Commonwealth* v. *Chambers* (1991) 528 Pa. 558 [599 A.2d 630].)" (*People* v. *Wrest* (1992) 3 Cal.4th 1088, 1107 [13 Cal.Rptr.2d 511, 839 P.2d 1020].)

The majority proposes that the issue of misconduct was waived because the defense failed to object to it.[2] I conclude that defense counsel's failure to

---

had no more government; so they were a codification or recognition of both religious and civil principles. [¶] And that's why you see this mixture of religious commandments and civil. Or in this case criminal commandments: Thou shalt not kill. [¶] Clearly that was among them. [¶] There are references, as I mentioned[,] to that concept, the concept of thou shalt not kill and what happens if you do throughout the Old Testament: [¶] 'Anyone who strikes a man—' [¶] This is from the Book of Exodus. [¶] 'Anyone who strikes a man and so causes death must die.' [¶] Beastiality [*sic*], fornicating with an animal was punishable by death. [¶] The Book of Leviticus had a similar message or concept. [¶] The Book of Numbers: 'He who had struck a person with an iron object so as to cause death is a murderer and he must be put to death.' [¶] The same message was delivered with respect to striking somebody with a stone instrument, with a wooden instrument. [¶] Now those are all God's law. [¶] Those were not man's law. [¶] And the message was very clear in those days. [¶] There are people who feel that there are contrary messages coming from the Old or the New Testament. [¶] And rather [than] wait for [defense counsel] to point those out to you, I want to tell you what they are and why they are not contrary to where we are here today or where the Jews were when they got the message from Moses. [¶] An eye for an eye. You are all familiar with that. [¶] And many people think that the rejoinder to that was the idea that that was not to imply that you couldn't impose life punishment on somebody was 'Vengeance is mine sayeth the Lord.' [¶] It's true that 'Vengeance is mine sayeth the Lord' seems to countermand, seems to offset the idea that an eye for an eye was the appropriate punishment. But that wasn't the point. [¶] Because when you read on subsequent to 'Vengeance is mine' it was clear that the message was: But you must submit to civil authorities. [¶] You must render unto Ceaser [*sic*] the things that are Ceaser's [*sic*]. [¶] The reason that when Jesus came on the scene and talked about love and compassion for human beings was that by that time the Romans had established the rule. The Romans had established the law and so it was fitting for him to deliver messages filled with compassion. It was fitting for him to talk about forgiveness. But it was also clear that it was proper to render to Ceaser [*sic*] the things that are Ceaser's [*sic*]. And those were the laws, in existence, at the time. [¶] God recognized there'd be people like Mr. Wash. That's why those commandments were delivered. That's why that message is throughout the Old Testament. [¶] Who must be punished for what they have done and if they have done things like he's done they must forfeit their lives for what he's done."

[2]The general rule is that to preserve a claim of prosecutorial misconduct for review on appeal, "the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct. [Citation.]" (*People* v. *Price* (1991) 1 Cal.4th 324, 447 [3 Cal.Rptr.2d 106, 821 P.2d 610].) Our rule is in accord with the United States Supreme Court's observation that " 'some occurrences at trial may be too clearly prejudicial for such a curative instruction to mitigate their effect . . . .' " (*Caldwell* v. *Mississippi* (1985) 472 U.S. 320, 339 [86 L.Ed.2d 231, 245-246, 105 S.Ct. 2633].) Although purporting to find the issue of

object deprived defendant of the effective assistance of counsel guaranteed by the Sixth Amendment to the United States Constitution.

As the high court has explained, in order to amount to constitutionally ineffective assistance, an attorney's act or omission must fall below an objective standard of reasonableness under prevailing professional norms, and must have resulted in prejudice to the defendant. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693, 104 S.Ct. 2052].)

Defense counsel's failure to object to the prosecutor's extensive argument that defendant should be put to death based on biblical principles is inexcusable. Although we have stated that a failure to object to a prosecutor's argument "seldom" establishes incompetence (*People* v. *Ghent* (1987) 43 Cal.3d 739, 772 [239 Cal.Rptr. 82, 739 P.2d 1250]), in this case there could be no legitimate tactical justification for counsel's failure to object to the prosecutor's dramatic and specific biblical argument. We cannot say here, as we could in *Ghent*, that "[c]ounsel may well have tactically assumed that an objection or request for admonition would simply draw closer attention to the prosecutor's isolated comments." (*Id.* at p. 773.) Here, the prosecutor's religious argument was not isolated, but expansive and fully developed. No objection could have drawn any closer attention to this main theme of the prosecutor's argument that the prosecutor had drawn himself.

As the majority notes, defense counsel "not only failed to object to the prosecutor's remarks, but countered them by citing a number of religious authorities to support his argument against the death penalty." (Maj. opn.,

---

prosecutorial misconduct based on improper religious argument waived, the majority then engages in a lengthy discussion of the merits of the claim.

In this case, it is probable that an admonition would not have cured the harm, and thus this court can reach the question of prosecutorial misconduct despite defense counsel's failure to object. It is true that a timely objection and admonition made by defense counsel when the prosecutor made his first references to religious authorities would likely have dispelled any harm. (Contra, *Commonwealth* v. *Chambers* (1991) 528 Pa. 558 [599 A.2d 630, 644].) But the occasion for objection by defense counsel did not end after the first religious references made by the prosecutor. The prosecutor continued and developed his religious argument, going beyond what might have been a brief reference to religion, quoting a number of biblical passages approving capital punishment, and finally linking the religious theme of biblical approval for the death penalty with the specific task before the jury by stressing, "God recognized there'd be people like Mr. Wash. . . . [I]f they have done things like he's done they must forfeit their lives for what he's done." Thus, the prosecutor's religious argument became progressively more inflammatory. As the prosecutor's religious argument progressed to its conclusion, each additional religious reference presented an additional opportunity for objection. By the end, any objection unquestionably would have been futile; the cumulative effect of the religious references could not have been dispelled by an objection and admonition.

Accordingly, the majority's discussion of the merits of the claim of prosecutorial misconduct is proper. It is the majority's resolution of the claim that is erroneous.

*ante*, at p. 260.)[3] But it is improper to answer one impermissible argument not based on the facts or the law applicable to the case with another impermissible argument not based on the facts or the law applicable to the case. A religious argument against the death penalty is no more acceptable at the penalty phase of a capital case than a religious argument in favor of the death penalty. (*People* v. *Sandoval* (1992) 4 Cal.4th 155, 194 [14 Cal.Rptr.2d 342, 841 P.2d 862] ["What is objectionable is reliance on religious authority as supporting or opposing the death penalty. The penalty determination is to be made by reliance on the legal instructions given by the court, not by recourse to extraneous authority."]; *Commonwealth* v. *Daniels* (1992) 531 Pa. 210 [612 A.2d 395, 404] [same].) Our courts are not ecclesiastical courts, and our juries do not base their decisions on religious law no matter whom such law may be said to favor. Because arguments by both the prosecutor and defense counsel exceeded the bounds of inferences that may be drawn from the evidence and considerations that may properly be brought to bear under the factors specified in the death penalty statute, both arguments were improper. It follows that defense counsel's decision to respond to the prosecutor's religious argument by relying on opposing religious authority cannot be considered a legitimate tactical choice that would excuse his failure to object to the prosecutor's impermissible religious argument.

As noted above, a defendant who seeks to establish that his or her Sixth Amendment right to the effective assistance of counsel was violated must show that defense counsel's defective performance resulted in prejudice. I will return to the question of prejudice after I discuss another closely related instance of prosecutorial misconduct during the penalty phase closing argument in this case.

2. *Improper Argument Based on Letter in Unrelated Case*

In his closing argument at the penalty phase of this capital trial, the prosecution not only relied on religious authority, as I discussed earlier, but he also improperly urged the jurors to return a verdict of death based on

---

[3]Defense counsel argued: "You know, [the prosecutor] also told you the death penalty is proper under the laws of God. He reached back to the Scriptures and he made a Biblical analysis. [¶] The truth is: The death penalty today is condemned by most religious beliefs. [¶] Pope John Paul the II has condemned the death penalty; even as applied against the person who tried to take his life. [¶] Pope Paul the VI before him also spoke against the death penalty. [¶] The death penalty has been called immoral by the leaders in many churches. [¶] The National Counsel [*sic*] of Churches has taken a stand. Leaders in churches here in California and in synogogues [*sic*] throughout California have taken a stand against it. [¶] California Catholic Conference has taken a stand against it. . . . [¶] So what do we make of this stand of the religious leaders? [¶] Well, clearly, it shows us that [the prosecutor] is wrong when he implies that God freely sanctions the execution of Mr. Wash. Others much closer to God than [the prosecutor] will surely disagree with that."

extraneous matters. After referring to a notorious but unrelated criminal case, the prosecutor went on to tell the jurors:

"There has been a lot of criticism of the Court system and most of it is well deserved. Much of what we do is done in too much secrecy. People have no idea what goes on.

". . . . . . . . . . . . . . . . . . . . . . . . . . .

"And you don't realize it, but the twelve of you who decide this case can make a statement. And there is nothing wrong about making a statement. The statement can be directly to him. And if there is a lesson to be learned from anybody else or by anybody else, then so about be it.

"As jurors, you can do something. You can take a position now. . . ."

The prosecutor then announced that he would read "a letter to a judge from a father whose son had been murdered . . . ." Over defense objection, the prosecutor read this letter aloud to the jurors as part of his argument:

" 'There has been a furor in the media over the condition of our justice system, particularly juvenile justice. The decision made here today will not ease the pain of the family and the friends of Rod Sullivan. Nothing can do that. We are learning to live with it. But it is our hope that today's decision will bring back some of the confidence and trust that we in the community once had in this system.' " The prosecutor then added, "And that's all I want you to do."

That argument was improper. It was not based on the facts of the case or the law applicable to those facts, but was a blatant appeal to the jury to sentence defendant to death based on considerations that had nothing to do with the "*individualized* determination" the jury was constitutionally required to make. (*Zant* v. *Stephens* (1983) 462 U.S. 862, 879 [77 L.Ed.2d 235, 251, 103 S.Ct. 2733].) The prosecutor's observation of a perceived "furor in the media over the condition of our justice system" was " 'totally irrelevant to the sentencing process' " applicable to this defendant. (*Johnson* v. *Mississippi* (1988) 486 U.S. 578, 585 [100 L.Ed.2d 575, 584, 108 S.Ct. 1981].)

The majority attempts to sanitize this misconduct by quoting from *People* v. *Ghent*, *supra*, 43 Cal.3d at page 771: "Isolated, brief references to retribution or community vengeance . . . although potentially inflammatory, do not constitute misconduct so long as such arguments do not form the principal basis for advocating the imposition of the death penalty." *Ghent*,

however, has no application here. Our opinion in *Ghent* dealt with prosecutorial references to retribution and community outrage against the particular defendant in that case, not some more generalized outrage or "furor" over the criminal justice system. Moreover, the references in this case were neither isolated nor brief. The prosecutor's "send a message" theme was an important part of his closing argument. If, as the majority holds, prosecutors can urge juries to impose sentences of death on defendants based on the perceived failings of the criminal justice system in *unrelated* cases, the individualized determination the United States Supreme Court has stated is required in capital cases is effectively a nullity.

### 3. *Prejudice Analysis*

In this case, the combined effect of defense counsel's failure to object to the prosecutor's inflammatory and improper argument in favor of the death penalty on religious grounds, and the prosecutor's equally inflammatory and improper argument to the jury that it should return a death verdict based on the alleged failure of the criminal justice system in other cases, require that the penalty phase verdict be set aside.

Under *Strickland* v. *Washington, supra,* 466 U.S. at page 694 [80 L.Ed.2d at pages 697-698], a defendant seeking to establish constitutionally ineffective assistance of counsel "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." As the high court has explained recently, the harmless error inquiry a court must make when a defendant has been deprived of other federally guaranteed rights is "whether the . . . verdict actually rendered in *this* trial was surely unattributable to the [misconduct]." (*Sullivan* v. *Louisiana* (1993) 508 U.S. __ [ 124 L.Ed.2d 182, 188-189, 113 S.Ct. 2078, 2081].) In my view, the penalty phase verdict in this case cannot withstand scrutiny under any standard.

Here, the case in aggravation was not overwhelming. The circumstances of the offenses were unquestionably brutal. But the only other aggravating evidence was that appellant had two prior convictions for nonviolent crimes —nonresidential burglaries—in Indiana. Thus, we do not have an escalating series of violent crimes.

Defendant presented a case in mitigation that was also not particularly strong; it consisted of his testimony and that of his family members and friends, and emphasized the bleak circumstances of his childhood. But the death penalty was clearly not a foregone conclusion in this case. This is

demonstrated by the fact that at the first penalty phase trial the prosecution relied on the evidence presented at the guilt phase, which was essentially identical to that presented at the penalty phase retrial, and on the two prior convictions for nonresidential burglaries. At that first trial, the prosecutor did not urge the jury to impose the death penalty on religious grounds, nor did he urge the jury to choose the ultimate punishment on the basis of asserted failures of the criminal justice system in unrelated cases. To the contrary, the prosecutor asked the jury to "remember you're only deciding what should happen to [the defendant] because of what he did on March 21st and who he is." After five days of deliberation, the first penalty phase trial ended in a deadlocked jury (nine to three).

Under the circumstances, and after examination of the record, I cannot say with reasonable confidence that, without the prosecutor's egregious misconduct and defense counsel's ineffective assistance, the jury would have returned a verdict of death. Accordingly, I would reverse the judgment of death.

Appellant's petition for a rehearing was denied January 20, 1994. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.